**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KMART CORPORATION, a Michigan corporation, | ) |
| | ) |
| | ) No. 09 CV 3607 |
| Plaintiff, | ) |
| | ) Magistrate Judge Susan E. Cox |
| v. | ) |
| | ) |
| FOOTSTAR, INC., a Delaware corporation, | ) |
| LIBERTY MUTUAL FIRE INSURANCE | ) |
| COMPANY, a Wisconsin corporation, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER[1]**

In this breach of contract, insurance coverage, and declaratory judgment action, plaintiff,

Kmart Corporation ("Kmart"), seeks reimbursement of $141,755.92 in defense costs plus

indemnification for $300,000.00 and a $10,000.00 Kmart gift card paid by Kmart to settle an

underlying lawsuit, *Judy Patrick and Michael Patrick v. Kmart Corporation* (the "Patrick Lawsuit").

That suit involved a Kmart shopper who, while being assisted by an employee of defendant Footstar,

Inc. ("Footstar"), was struck by a stroller that fell off a shelf.[2]  On August 3, 2011, Kmart, as well

as defendants Footstar and its insurer, Liberty Mutual Fire Insurance Company ("Liberty"), filed

cross-motions for summary judgment.[3]  For the reasons set forth below, Kmart's motion is granted

in part, and denied in part [dkt. 208], Footstar's motion is denied  [dkt. 211] and Liberty's motion

---

[1] On August 25, 2009, by the consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (dkts. 21, 22).

[2] Kmart also seeks litigation expenses for the instant action from Liberty, under a theory that Liberty acted in bath faith by denying coverage to Kmart. *See* dkt. 209 at 32-39. Kmart's bad faith allegation is reserved for later determination.

[3] *See* dkts. 205 (Liberty's Motion for Summary Judgment), 208 (Kmart's Motion for Summary Judgment On Counts One Through Five of Its Second Amended Complaint and On Defendants' Affirmative Defenses), and 211 (Footstar's Motion for Summary Judgment).

is denied [dkt. 205].

## I.     JURISDICTION AND VENUE

Kmart is a Michigan corporation based in Hoffman Estates, Illinois, whose stores sell and distribute various retail and consumer goods.[4]  Footstar was a company incorporated in Delaware that engaged in the business of operating footwear departments in certain Kmart stores.[5]  Liberty is a Wisconsin company based in Boston, Massachusetts, that underwrites commercial general liability insurance for businesses such as Footstar.[6]  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00, and the parties are citizens of different states.  Venue is proper under 28 U.S.C. § 1391(a) and  pursuant to Section 21.7 of the Amended and Restated Master Agreement between Kmart and Footstar, which provides that the parties shall submit to the jurisdiction of "the United States District Court at Chicago, Illinois" with respect to "any right or remedy in connection with [the agreement]."[7]

---

[4]KSOF ¶ 2; FRESP ¶ 2.
[5]KSOF ¶ 3; FRESP ¶ 3; ex. 2 of FRESP.  *See* KSOF ¶ 18; FRESP ¶ 18; dkt. 208, exs. 4, 32.
[6]KSOF ¶ 4; FRESP ¶ 4; dkt. 208, ex. 1.
[7]FSO1 at ¶ 6; KRESP1 ¶ 6; dkt. 73, at ¶6.

## II.     STATEMENT OF FACTS[8]

On July 27, 2005, Judy Patrick and her daughter, Tina Patrick, visited Kmart store # 4296 in Hollywood, Florida.  The Patricks were shopping in the infant department when they requested that an employee assist them with viewing a combination stroller, which had been chained to other strollers atop a four foot tall display.  While Mrs. Patrick was receiving assistance, she was struck and injured by a falling infant carrier that dislodged from one of the combination strollers.  Mrs. Patrick suffered a broken nose and required two surgeries on her neck vertebrae, including a disk fusion and the insertion of a metal plate.[9]  She and her husband sued Kmart for negligence and loss of consortium on May 7, 2006, believing that only Kmart employees had been involved in her accident.  On October 28, 2008, Kmart settled the case by paying the Patricks $300,000.00, plus a $10,000.00 Kmart gift card.[10]  Kmart now seeks reimbursement for that sum, plus legal expenses, from Footstar and Footstar's insurer, Liberty, because a Footstar employee had been assisting Mrs. Patrick at the time of her injury.

---

[8]Citations to the record are made in the following format:  Kmart's Local Rule 56.1 Statement of Facts [dkt. 210] is cited as KSOF ¶___;  Footstar's response and Local Rule 56.1 (b)(3)(C) Statement of Additional Material Facts [dkt. 277] is cited as FRESP ¶___;  Liberty's response [dkt. 238] to Kmart's Statement of Facts [dkt. 210] is cited as LRESP ¶___;  Kmart's Reply [dkt. 245 ]to Footstar's response [dkt. 277] is cited as KREP1 ¶___;  Kmart's Reply [dkt. 246] to Liberty's Response [dkt. 238] is cited as KREP2 ¶___.

Footstar's Statement of Facts [dkt. 225] is cited as FSOF ¶___;  Kmart's response to Footstar's Statement of Facts [dkt. 229] is cited as KRESP1 ¶ ___;  Footstar's reply [dkt. 242] to Kmart's statement of additional material facts is cited as FREP1 ¶___.

Liberty's Statement of Facts [dkt. 207 ] is cited as LSOF ¶___;  Kmart's response and Statement of Additional Facts [dkt. 233] is cited as KRESP2 ¶___;  Liberty's reply [dkt. 247] to Kmart's Statement of Additional Facts [dkt. 233] is cited as LREP1 ¶ ___.

[9]KSOF ¶ 106; FRESP ¶ 106; LRESP ¶ 106; dkt. 208, ex. 15 at KPAT08098-99; ex. 25 at tr. 214:10-215:7, ex 20 at 82.

[10]KSOF1 ¶ 102; FRESP ¶ 102; dkt. 208, exs. 15, 25, 40, 40A.

## A.     The Master Agreement Between Kmart and Footstar

On July 1, 1995, Kmart and Melville Shoe Corporation ("Melville") entered into a master agreement regarding the operation of footwear departments in certain Kmart stores by certain subsidiaries of Melville.[11]  By this time, Kmart and Melville had already executed three prior agreements, which would have been available for review during negotiations.[12] On March 25, 1996, Melville assigned its rights and obligations under the Master Agreement to Footstar.[13]

On August 24, 2005, Kmart and Footstar entered into the Amended and Restated Master Agreement (the "Master Agreement"), which remained in effect until December 31, 2008.[14] Pursuant to the Master Agreement, Footstar operated footwear departments in approximately 2,500 Kmart stores, including store #4296 located in Hollywood, Florida.[15]  It is undisputed that the majority of Footstar's revenue came from its contract with Kmart.[16]

The Master Agreement required Footstar to, among other things: (1) obtain a liability insurance policy for personal injury "arising out of or relating to the goods and services provided by [the Master Agreement]," (2) name Kmart as an additional insured, and (3) provide a copy of that insurance policy upon Kmart's request.[17]

---

[11]KSOF ¶¶ 11, 12; FR1 ¶¶ 11, 12; LRESP ¶¶ 11, 12; dkt. 208, exs. 4, 39, 5.

[12]KSOF ¶ 13; FRESP ¶ 13; ex. 4 of FRESP. In 1975 and 1984, Kmart (formerly known as S.S. Kresge) and Melville Melville entered into written agreements. KSOF ¶¶ 7, 9; FRESP ¶¶ 7, 9; LRESP ¶¶ 7, 9; dkt. 208, exs. 3,4, 36, 37. Under these agreements, a division of Melville called Meldisco operated the subsidiaries which operated footwear departments in certain Kmart stores. KSOF ¶ 8; FRESP ¶ 8; LRESP ¶ 8; dkt. 208, ex. 3.  In 1993, Kmart Corporation, Kmart Properties and Meldisco entered into a written license agreement. KSOF ¶ 10; FRESP ¶ 10; LRESP ¶ 10; dkt. 208, exs. 4, 38.

[13]KSOF ¶ 14; FRESP ¶ 14; dkt. 208, ex. 4.

[14]KSOF ¶¶ 15, 16; FRESP ¶¶ 15, 16; dkt. 208, exs. 1, 2, 4, 7.

[15]KSOF ¶ 17; FRESP ¶ 17; Exs 3, 1, 2 of KSOF.  Footstar operated these departments by its partially and wholly owned subsidiaries.

[16]KSOF ¶ 18; FRESP ¶ 18; Exs 4, 32 of KSOF.  Footstar has since filed for bankruptcy. KSOF ¶ 19; FRESP ¶ 19; exs. 4, 2 of KSOF.

[17]*Id.* at ¶ 18.1.

### B.    The Policy Between Footstar and Liberty

Liberty issued a commercial general liability insurance policy (the "Policy")[18] to Footstar,[19] which listed Kmart as an additional insured under a Blanket Additional Insured Amendment.[20] Before Liberty issued the Policy, Footstar provided a copy of the Master Agreement to Liberty for underwriting purposes.[21]  In 2000, Liberty also issued an Alternate Employer Endorsement that insured Kmart when Footstar employees were injured in the course of "special and temporary employment" by Kmart.[22]

Footstar was permitted to notify Liberty of incidents under the Policy through Liberty's claims reporting telephone line.[23]  Liberty's claims handlers would complete a standard form based on the information received from Footstar's telephone call.[24]  Once Liberty determined that Footstar was covered, Liberty investigated the claim or lawsuit, assigned counsel, and participated in the claim's resolution.[25]  Liberty admits that it determined whether additional insured coverage was triggered by the Policy,[26] and Footstar admits that, in this case, it delegated to Liberty the responsibility for determining whether Footstar was required to defend and indemnify Kmart in the Patrick Lawsuit.[27]

---

[18]Policy number RG2-63 1-004228-025.  KSOF, LRESP ¶ 22, dkt. 208, ex. 8 (the Policy).

[19]LSOF ¶ 237; KRESP2 ¶ 237; KSOF ¶ 22; FRESP ¶ 22; LRESP ¶ 22; dkt 208, exs 1, 2, 3, 8.

[20]*See* dkt. 73, ex. 2.

[21]KSOF ¶ 23; FRESP ¶ 23; LRESP ¶ 23; dkt. 208, ex. 3.

[22]KSOF ¶ 24; FRESP ¶ 24; LRESP ¶ 24; dkt. 208, ex. 3, 34, 35.

[23]KSOF ¶ 25-26; FRESP ¶ 25-26; LRESP ¶ 25-26; dkt. 208, ex 3.

[24]*Id.*

[25]*See* KSOF ¶ 29; FRESP ¶ 29; LRESP ¶ 29; ex. 3 of KSOF.

[26]*See id.*

[27]KSOF ¶ 30; FRESP ¶ 30.

C.    **Pre-suit Activity Related to the *Patrick* Claim**

On July 27, 2005, Judy Patrick was injured while shopping in Kmart Store #4296.[28] An incident report completed by Kmart on that date identifies the location of the incident as "infant dept. / strollers" and states under the heading "Customer's Description of Incident" that "[Judy Patrick] was trying to turn a stroller around and a car seat fell and hit her on the head."[29] The report contains the names, "clock" numbers, and signed statements of Kmart employee, Maribel Hohney, and Alex Sehat.[30] These statements indicate that, while Mr. Sehat was attempting to "bring down a stroller" for Mrs. Patrick at her request, she was injured while trying to take down another stroller by herself.[31] Though Mr. Sehat was a Footstar employee at the time, the report did not expressly identify him as such.[32]

On July 27, 2005, the incident was reported to Kmart's third party claims administrator, Sedgwick Claims Management Systems ("Sedgwick").[33] A claim intake form was prepared, which stated that "[t]he carrier which is attached to the stroller, fell off, and struck the claimant on the forehead."[34] In August of 2005, Dee Shelton of Sedgwick began investigating the Patrick incident and recorded her findings in a computer system called Juris.[35] On November 4, 2005, Ms. Shelton documented in Juris that Mr. Sehat was from the "shoe department."[36]

---

[28]KSOF ¶ 32; FRESP ¶ 32; LRESP ¶ 32; dkt. 208, exs. 9-12.

[29]Dkt. 205, ex. 8 at 1.

[30]*Id.* at 2-4.

[31]*See id.*

[32]*See id.*

[33]KSOF ¶ 34; FR1 ¶ 34; LRESP ¶ 34; ex. 9 of KSOF.

[34]FRESP (additional facts) ¶¶ 8, 9; KREP1 ¶¶ 8, 9.

[35]FSOF ¶¶ 54-58, 61; KRESP1 ¶¶ 54-58, 61, dkt. 207, exs. 3 tr. Vol I at 50:1-4, 52:12-14; ex. 9, KPAT08191, ex. 11, ¶¶ 3-4.

[36]FSOF ¶ 61; KRESP1 ¶ 61, dkt. 207, ex. 9, KPAT08191.

On January 26, 2006, Mrs. Patrick, through her attorney, made a pre-suit settlement demand on Kmart for $210,000.00.[37]  In response, Kmart offered $2,000 to settle the claim, which Mrs. Patrick rejected.[38] Juris notes from that date reflect Kmart's belief that Mrs. Patrick's medical bills totaled approximately $5,600, and that she had discontinued her treatment around that time.[39]  Mrs. Patrick's demand was not communicated to Footstar.[40]

### D.    Correspondence After the Initial and First Amended *Patrick* Complaints

On May 17, 2006, Judy and Michael Patrick filed a two-count complaint against Kmart and Sears in Broward County, Florida, alleging negligence and loss of consortium in connection with the July 27, 2005 incident.[41]  The complaint did not name Footstar because the Patricks were unaware that a Footstar employee had been involved.[42]  In fact, the complaint identified no specific employee, and merely alleged that "[d]efendants, through its [sic] agents, employees, staff and/or representatives who were acting in the course and scope of their employment" were negligent "in one or more of the following ways," including failing to properly secure merchandise on shelves, limit the height of merchandise on shelves, adequately warn of risks, and train employees.[43]

Kmart states that, at this point, it was also unaware that a Footsar employee had been involved in the incident.[44]  Footstar disputes this on the basis that Mr. Sehat's name, clock number,

---

[37]FRESP (additional facts) ¶ 16; KREP1 ¶ 16.

[38]FRESP (additional facts) ¶¶ 19-20; KREP1 ¶¶ 19-20.

[39]KRESP1 (additional facts) ¶ 26; FREP1 ¶ 26; dkt 211, ex 9, KPAT08188-89.

[40]FRESP (additional facts) ¶¶ 18; KREP1 ¶¶ 18.  Footstar also states that Mrs. Patrick later made a second pre-suit settlement demand for $180,000 at an unspecified date, which was never communicated to Footstar.  *See* FR1 (additional facts) ¶¶ 17-18.  However, the occurrence of this second demand is unsupported by evidence in the record.

[41]Dkt. 215, ex. 10.

[42]The Patricks did not know that Alex Sehat was a Footstar employee until May 2007.  KSOF1 ¶ 73; FRESP1 ¶ 73; LRESP1 ¶ 73.

[43]*Id.*

[44]KSOF ¶ 39.

and a phone number attributed to Mr. Sehat would have appeared on the July 27, 2005 incident report.[45]  On June 30, 2006, the Patricks filed an amended complaint which dropped Sears, but was identical in all other material respects.[46]

On August 14, 2006, Kmart's defense counsel noted an interview with Mr. Sehat, during which Mr. Sehat stated that he was a Footstar employee.[47]  The interview was documented in the TLEX system, which Kmart used to communicate with Sedgewick's claims handlers and outside counsel.[48]  Footstar states, and Kmart does not dispute, that "Kmart had all the information it needed to tender the Patrick Lawsuit to Footstar in August of 2006."[49]

Kmart states that, in May 2007, Marcia Kaiser, Managing Litigation Counsel for Sears Holdings Management Corporation, sent a letter to Maureen Richards, General Counsel for Footstar, requesting defense and indemnification for the Patrick Lawsuit, as well as a copy of the Policy.[50] The letter, dated May 23, 2007, states that it was sent via certified mail.[51]  However, no Footstar employee has confirmed receipt of the letter.[52]  And, for reasons unknown, Kmart has produced no return receipt for the letter in discovery.[53]  Further, the letter's author, Marcia Kaiser, does not recall

---

[45]*See* FR1 ¶ 39.

[46]Dkt. 215, ex. 11.

[47]KSOF ¶ 40; FR1 ¶ 40; FSOF ¶ 84; ex. 16 of KSOF.

[48]FSOF ¶¶ 80-84; KRESP1 ¶¶ 80-84.

[49]FSOF ¶ 90; KRESP1 ¶ 90; dkt. 207 at ex. 12, tr. Vol. II, 182:8-14.

[50]*See* KSOF ¶ 41; dkt. 208, ex. 17.

[51]FRESP (additional facts) ¶ 25; KREP1 ¶ 25, dkt. 211, ex. 33.

[52]Kmart admits that "Michael Mital [of Footstar] testified that he had not seen the May 23, 2007 letter prior to his deposition and that he had no reason to believe that the letter was not sent to Maureen Richards on or about May 23, 2007, and that when asked whether she had received a copy of the May 23, 2007 letter Maureen Richards answered, 'I don't know.'" *See* KREP1 ¶ 24; dkt. 208 ex. 56 at 120:15-18, ex. 57 at 100:20-101:11.

[53]FRESP (additional facts) ¶¶ 26-27; KREP1 ¶¶ 26-27, dkt. 211, ex. 7.

having received a return receipt,[54] and there is no evidence that the letter was recorded in Juris.[55] Footstar states, and Kmart does not dispute, that "[a]fter allegedly sending the May 23, 2007 letter to Footstar, Kmart did not follow-up with Footstar until January 24, 2008."[56]

The Patricks did not know that Mr. Sehat was a Footstar employee until May 2007.[57] On May 30, 2007, the Patricks' attorney, Michael Feiner, called Maureen Richards of Footstar in relation to the suit and requested a copy of Mr. Sehat's employment records.[58] On June 6, 2007, a representative of Footstar reported the Patrick incident to Liberty as an "incident only" claim.[59] Footstar claims that it first became aware of the Patrick Lawsuit on this date.[60] Liberty accepted telephonic notice of the Patrick Lawsuit, and did not require anything in writing.[61] While Liberty's claims handler testified that it was normal practice to request a copy of the complaint when investigating coverage, there is no evidence that Liberty did so in this case.[62]

Liberty kept claims notes on the Patrick Lawsuit which document its initial correspondence with Footstar.[63] A claims handler at Liberty recorded that "[t]here is a law suit filed against Kmart for this incident. The only reason the [insured] is calling in the accident due to their employee helping the [claimant] at the time of the incident. The caller states they are not involved in the suit

---

[54]FRESP (additional facts) ¶ 29; KREP1 ¶ 29, dkt. 218, ex. 5.

[55]*See* FSOF ¶ 113; KRESP1 ¶ 113 (Kmart disputes Footstar's statement that mention of the May 23, 2007 letter is absent from Juris, but provides no evidence to the contrary).

[56]FRESP (additional facts) ¶ 30; KREP1 ¶ 30.

[57]KSOF ¶ 73; FRESP ¶ 73; LRESP ¶ 73.

[58]KSOF ¶ 42; FRESP ¶ 42; LRESP ¶ 42; exs. 3, 4, 28 of KSOF.

[59]KSOF ¶ 45; FRESP ¶ 45; LRESP ¶ 45.

[60]KSOF ¶ 46; FRESP ¶ 46, LRESP ¶ 46.

[61]KSOF ¶ 49; FRESP ¶ 49.

[62]*See* KSOF ¶¶ 50-51; FR1 ¶¶ 50-51; LRESP ¶¶ 50-51.

[63]KSOF ¶ 44; FR1 ¶ 44; exs. 20-21 of KSOF.

at this time."[64]   An entry reflecting a June 7, 2007, interview with Mr. Sehat reads: "[w]hile attempting to pull a box, the box fell and struck the plaintiff . . . [Mr. Sehat] doesn't know who exactly was pulling the box at the time."[65]  Mr. Sehat was further recorded as stating that "he felt compelled to" assist the Patricks, and that "any other [employee] would have done the same to try and prevent the customers from making a scene."[66]  The entry continued:"Customer does not want us to make contact with [plaintiff's] attorney or Kmart's employee at this time as we are not yet a party in this case."[67]

After speaking with Mr. Sehat, Liberty's claims handler verified coverage for Footstar and set a reserve of $3,500.00.[68]  On June 12, 2007, the claims handler wrote: "I expect we will be brought in as a party to the case in the near future and we must be prepared for same. If that is the situation, we will look to tender the claim to Kmart . . . ."[69]

Kmart admits that, on July 31, 2007, Mrs. Patrick made an offer of judgment on Kmart for $185,400.00, and that Kmart did not communicate this offer to Footstar.[70]

### E.      Depositions in the Patrick Lawsuit

From August through November of 2007, there were various depositions taken in the *Patrick*

---

[64]Dkt. 208, ex  20.

[65]Dkt. 208, ex. 20 at 138.

[66]KSOF ¶ 54, dkt. 208, ex. 20 at 115.  At FRESP ¶¶ 54-57 and LRESP 1 ¶¶ 54-57, Footstar and Liberty object to Kmart's reproduction of the language from the Liberty claim notes as unsupported by the record.  The Court notes that Kmart erroneously listed Exhibit 19 as the source of this language, when the claim notes are in fact marked as exhibit 20.  The Court will excuse this error, as Kmart's representation of the language from these claim notes is otherwise accurate.

[67]*Id.*

[68]KSOF ¶ 55, dkt. 208, ex. 20 at 136.

[69]KSOF ¶ 56, dkt. 208, ex. 20 at 134.

[70]*See* FRESP (additional facts) ¶¶ 38, 39; KRESP1 ¶¶ 38, 39.

Lawsuit.[71]  It does not appear that Kmart provided Footstar with prior notice of these depositions.[72]

Meanwhile, on August 16, 2007, a supervising claims handler at Liberty wrote that: "The [insured's]

employee may or may not be involved. Did they have their hand on the stroller and if they did were

the [sic] pulling it."[73]  On August 21, 2007, Mr. Sehat was deposed without representation from

counsel.[74]  It is undisputed that, by this time, Kmart was aware that Mr. Sehat was a Footstar

employee.[75]

        The accounts of the July 2005 incident provided in the deposition testimony of Mr. Sehat and

Ms. Hohney differ significantly from that provided by Judy and Tina Patrick.  All four witnesses

testified that Mr. Sehat called someone over the loudspeaker to assist the Patricks with the stroller.[76]

Mirabel Hohney testified that she went to the infant department after "someone told [her] that they

needed help in the stroller department."[77]  However, Mr. Sehat and Ms. Hohney testified that Judy

Patrick smelled of alcohol on the date of the incident and Mr. Sehat described her behavior as

"erratic."[78]  Mr. Sehat also testified that "in front of [Judy and Tina Patrick] were a whole bunch of

big stroller boxes opened, knocked down, and the entire aisle was covered with merchandise, which

was taken out of boxes."[79]  In contrast, Judy and Tina Patrick testified that Judy Patrick was not

---

[71]FRESP (additional facts) ¶ 35; KRESP1 ¶ 35; dkt. 211, ex 7 at 119:19-22.

[72]*See* FRESP (additional facts) ¶¶ 34, 36; KRESP1 ¶¶ 34, 36 (Kmart maintains that  Liberty's claim notes for July 8, 2008 indicate that Footstar's defense counsel in the Patrick Lawsuit had "recently acquired" the transcripts of the depositions of Judy Patrick, Tina Patrick, Alex Sehat, Maribel Hohney, Rashan Gamadia, and George Calhoun. (dkt. 208, ex. 20)).

[73]KSOF ¶ 57, dkt. 208, ex. 20 at 131.

[74]FRESP (additional facts) ¶¶ 34, 36; KREP1 ¶¶ 34, 36.

[75]FRESP (additional facts) ¶ 43; KREP1 ¶ 43.

[76]*See* FSOF ¶ 22; KRESP1 ¶ 22.

[77]*See* FSOF ¶ 24; KRESP1 ¶ 24; dkt. 35-F, tr at 9:16-21.

[78]*See* FSOF ¶ 29; KRESP1 ¶ 29; dkt. 207, ex. 1, tr. at 31:14-24; ex 2, tr at 11:10-24.

[79]*See* FSOF ¶ 21; KRESP1 ¶ 21; KSSOF1 ¶ 2.

erratic on the date of the incident, had not had any alcohol to drink,[80] and that there were no boxes in the aisle of the infant department.[81]

Both Mr. Sehat and Ms. Hohney testified that Judy Patrick was pulling on an elevated display stroller when a car seat fell out and struck her about the face.[82] Judy and Tina Patrick, on the other hand, testified that Judy Patrick never touched the strollers on display, and Judy Patrick testified that, while Mr. Sehat was attempting to untangle the wheels of two strollers, she was "just sitting there watching . . . ."[83] Tina Patrick testified that Mr. Sehat "jiggled," "wiggled," "pushed," and "pulled" the strollers, and that the stroller fell shortly after.[84] It is undisputed that Mr. Sehat did not touch the infant carrier which dislodged from one of the strollers and struck Judy Patrick.[85]

Two managers from Kmart store #4296 testified in depositions. Roshan Garnadia, the manager responsible for securing overhead merchandise,[86] stated that, from 2001 to July 26, 2007, the stroller section of the relevant Kmart store contained one to seven strollers on a four foot shelf.[87] In addition, Mr. Garnadia testified that securing overhead merchandise was important to customer safety,[88] and that he had never seen a car seat not locked into a stroller.[89] George Calhoun, the store's loss prevention manager, testified (in response to a hypothetical) that a chained stroller would not come off the shelf.[90]

---

[80] *See* FSOF ¶ 29; KRESP1 ¶ 29; KSSOF1 ¶ 6.

[81] *See* FSOF ¶ 21; KRESP1 ¶ 21; KSSOF1 ¶ 2.

[82] *See* FSOF ¶ 32; KRESP1 ¶ 32; KSSOF1 ¶ 8.

[83] *See id.*

[84] *See* FSOF ¶ 34; KRESP1 ¶ 34; KSSOF1 ¶ 9.

[85] *See* FSOF ¶ 32; KRESP1 ¶ 32, dkt. 207, ex. 1, tr. at 34:1-16; ex 2, tr. at 12:14-21.

[86] LSOF ¶ 21; KRESP2 ¶ 21; dkt. 205, ex. 3 at 4, 8-9.

[87] LSOF ¶ 23; KRESP2 ¶ 23; dkt. 205, ex. 3 at  43-44.

[88] *See* LSOF ¶ 22; KRESP2 ¶ 22; dkt. 205, ex. 3 at 10-12.

[89] *See* LSOF ¶ 26; KRESP2 ¶ 26; dkt. 205, ex. 3 at 66, 71.

[90] FSOF ¶ 148; KRESP1 ¶ 148.

On October 5, 2007, Liberty's claims handler wrote: "liability possible . . . Did Footstar employee touch the stroller causing it have [sic] the car seat fall out or was this the action of the claimant in trying to remove the stroller.[91] The claims handler then references a conversation with Footstar, and states: "Customer wants us to keep a low profile."[92]

### F. Kmart's Request is Received by Footstar and Transmitted to Liberty

On January 24, 2008, Kmart's defense counsel, Dorothy Negrin, sent a letter to Footstar requesting a defense and indemnity, as well as a copy of the Policy.[93] This request was documented in Juris.[94] The letter did not contain the words "additional insured" or "insurance coverage."[95] Footstar forwarded the request to Liberty on January 30, 2008.[96] The following day, the Patricks amended their complaint by naming Footstar as a defendant, and identifying Mr. Sehat as "an employee of Defendant Footstar, and/or an apparent agent of Defendant, Kmart."[97]

### G. The Second *Patrick* Complaint is Filed

The Patricks' Second Amended Complaint included detailed allegations. It alleged that Mrs. Patrick and her daughter were shopping for a combination baby stroller and infant carrier at Kmart when they asked Mr. Sehat if he worked at the store.[98] After Mr. Sehat allegedly responded "in the affirmative," Mrs. Patrick "summoned [him] for assistance in order to take a closer look at the combination strollers, that were displayed on top of an overhead platform."[99] The Patricks allege

---

[91]KSOF ¶ 58; FRESP ¶ 58, dkt. 208, ex. 20 at 130.

[92]KSOF ¶ 59; FRESP ¶ 59, dkt. 208, ex. 20 at 131-32.

[93]FRESP (additional facts) ¶ 44 KREP1 ¶ 44; dkt. 211, ex. 35.

[94]*See* dkt. 207, ex. 9, KPAT08116.

[95]LSOF ¶ 91; KRESP2 ¶ 91; dkt. 205, ex. 91.

[96]FRESP (additional facts) ¶ 47; KREP1 ¶ 47.

[97]Dkt. 208, ex. 12 at 2.

[98]*Id.* at ¶7-8.

[99]*Id.* at ¶¶ 9-10.

that Kmart employee Maribel Hohney arrived and "assisted [Mr.] Sehat, in assisting [Mrs. Patrick],"[100] and that the combination strollers – which were linked together by a loose chain – sat atop an overhead shelf, and the infant carrier within the stroller in question "sat on top of said stroller, in an unsecured and/or unlocked fashion."[101]  The Patricks asserted that Mr. Sehat and Ms. Hohney "had no knowledge" and "never warned" Mrs. Patrick that the infant carrier was unsecured.[102]  The Patricks also alleged that "[Mr.] Sehat attempted to bring down the combination stroller in question from the overhead platform, and in doing so, the infant carrier fell out of the stroller, and struck [Mrs. Patrick] about her face."[103]

Mrs. Patrick alleged separate negligence claims against Kmart and Footstar.[104]  Mr. Patrick also alleged a derivative claim for loss of consortium against both Kmart and Footstar.[105]

### 1.    Count I - Kmart

Mrs. Patrick alleged that Kmart "did negligently and carelessly, own, operate, maintain and control" the premises, "in one or more of the following ways:"

a)      by allowing unsecured merchandise to exist on an overhead platform . . .

b)      by failing to properly maintain the merchandise as described above, although Defendant knew, or in the exercise of reasonable care should have known, about the existence of said condition . . .

c)      by failing to properly remove the merchandise as described above from the overhead platform, although defendant knew, or in the exercise of reasonable care should have known, about the existence of said condition . . .

---

[100]*Id.* at ¶ 11.

[101]*Id.* at ¶ 13-14.

[102]*Id.* at ¶¶ 15-18.

[103]*Id.* at ¶ 19.

[104]*Id.* at ¶¶ 22, 24.

[105]*Id.* at ¶¶ 24-25.

d)     by failing to provide adequate warnings and/or other reasonable notice of the aforedescribed unsafe, dangerous, and hazardous conditions to customers . . .

e)     The aforedescribed conditions were a continuous and ongoing condition on Defendant's premises, and for that reason Defendant was on actual and/or constructive notice of said condition.

f)     The aforedescribed conditions were created by the Defendant, and for that reason Defendant was on actual and/or constructive notice of said condition.[106]

## 2. Count II - Footstar

Mrs. Patrick also alleged that Footstar "did negligently and carelessly, own, operate, maintain and control" the premises "in one or more of the following ways:"

a)     by failing to properly remove the merchandise as described above from the overhead platform, although defendant knew, or in the existence of said condition . . .

b)     by failing to provide adequate warnings and/or other reasonable notice of the aforedescribed unsafe, dangerous, and hazardous conditions to customers . . . .[107]

## 3. Count III - Kmart and Footstar

Mr. Patrick alleged that, as a result of Kmart and Footstar's negligence, he has been "deprived of the services, society, and consortium" of Mrs. Patrick.[108]

---

[106]*Id.* at ¶21.

[107]*Id.* at ¶23.

[108]*Id.*

## H.    Liberty Assumes the Defense of Footstar and Denies Coverage to Kmart

On February 1, 2008, Liberty decided to defend Footstar in connection with the Patrick Lawsuit.[109]  Footstar sent Liberty a copy of the second amended complaint,[110] and Liberty retained the Law Office of Maria Dantes Sanches to defend Footstar, which assigned attorney Richard Llerena to the case.[111]  The claims notes contain Mr. Llerena's summaries of interrogatory answers, depositions, and medical records from the Patrick Lawsuit.[112]  These summaries show that Mr. Llerena was aware of Mrs. Patrick and Tina Patrick's deposition testimony that Mrs. Patrick did not touch the strollers and was struck by the infant carrier because "Alex Sehat was trying to disentangle the wheels of 2 different strollers, one of which [Mrs. Patrick and Tina Patrick] wanted to see."[113]  In the claim notes, Mr. Llerena expressed doubt as to whether he could successfully defend Footstar on a theory that Mr. Sehat was acting outside the scope of his employment.[114]

Footstar objects to the admissibility of statements taken from the Patricks' deposition testimony on hearsay grounds.[115]  However, we find that the depositions are admissible because Kmart is not introducing the testimony for the truth of the matter asserted, i.e. to show what actually took place during the July 27, 2005 incident.  As Kmart points out, whether or not the Patricks' testimony is "true" is not relevant to our inquiry, which instead looks to whether the Patricks' allegations put Liberty on notice that Kmart was facing liability for a potentially covered claim.[116]

---

[109]KSOF ¶ 77; FRESP ¶ 77; LRESP ¶ 77; dkt. 208, ex. 20 at 106.

[110]KSOF ¶ 75; FRESP ¶ 75; LRESP ¶ 75; dkt. 208, ex. 3.

[111]KSOF ¶ 77; FRESP ¶ 77, dkt. 208, ex. 20 at 121.

[112]KSOF ¶ 81; FRESP ¶ 81, dkt. 208, ex. 20 at 96-105.

[113]KSOF ¶ 81; dkt. 208, ex. 20, at 103-105, ex. 35 at 117:12-137:7, ex. 35D, 42:17-60:24.

[114]*See* dkt. 208, ex. 20 at 115, 117.  In KSOF ¶ 95, Kmart erroneously cites to exhibit 19.

[115]*See* FRESP ¶ 81.

[116]Dkt. 255 at 10-11; *see SL Indus., Inc. v. Am. Motorists Ins. Co.*, 607 A.2d 1266, 1272 (N.J. 1992).

In his notes, Mr. Llerena described the following legal strategy for defending Footstar in the Patrick Lawsuit:

> We can get by allowing Kmart to take the lead in defending the case, and then we can come in and deflect liability by essentially pointing to this flawed policy with Kmart. This will significantly reduce legal expenses. We anticipate that Kmart will likely look to point the finger at Footstar. Plaintiff is unlikely to take a firm position on who is more liable.[117]

On February 12, 2008, Liberty wrote a letter to Kmart's counsel refusing to defend or indemnify Kmart in connection with the Patrick Lawsuit.[118] Liberty maintains that it did not , however, "refuse tender from Kmart pursuant to additional insured coverage under the General Liability Policy in as much as no tender was requested from Kmart."[119] Liberty admits that it communicated no other reasons for denying coverage than those contained in the letter.[120]

In his deposition, Liberty claims handler, Richard Fitzmaurice, indicated that he had not read the Policy before drafting the letter.[121] The letter stated that "Meldisco/Footstar is not responsible for the referenced claim as it is not a product liability incident."[122] The letter continued by stating that, under Section 18.1 of the Master Agreement, "Kmart is fully responsible for insuring Meldisco/Footstar for personal injuries associated with the use of the Footwear Department premises, including, but not limited to, incidents of the type [in this case]."[123] The letter further stated that Kmart should instead defend and indemnify Footstar in connection with the Patrick

---

[117]KSOF ¶ 96; FRESP ¶ 96, LRESP ¶ 96, dkt. 208, ex. 20 at 114.

[118]KSOF ¶ 67; LRESP ¶ 67; dkt. 208, ex. 3.

[119]*See* LRESP ¶ 67, dkt. 205, ex. 21, 23.

[120]KSOF ¶ 69; LRESP ¶ 69; dkt .208, exs. 20-21.

[121]KSOF ¶ 70, dkt. 208, ex 21, tr 86:11 - 87:4, 89:7 - 90:14, 116:11 - 117:3.

[122] Dkt. 208, ex. 23 at1.

[123]*Id.* at 1-2.

incident.[124]  The letter did not attach or mention the Policy.[125]

Liberty admits that "it did not determine" whether the Policy issued to Footstar covered Kmart "because Kmart did not a make a tender to Liberty for additional insured coverage."[126] Liberty also admits that Mr. Fitzmaurice requested legal advice from Liberty's counsel as to whether the insurer had any obligation to provide a copy of the Policy,[127] but does not claim to have then provided a copy of the Policy to Kmart.[128]  Liberty only asserts that Kmart could have ascertained coverage from the Certificate of Insurance that Footstar would have provided to Kmart after securing the Policy.

Kmart observes that, throughout this process, Liberty never contacted Kmart to inquire whether Kmart desired a defense or indemnification in connection with the Patrick Lawsuit.[129] Footstar denies this statement, but at the same time admits that Liberty did not contact Kmart until its February 11, 2008 response letter denying Kmart's request for coverage.[130]  Liberty also denies Kmart's statement, claiming that it did not contact Kmart from "August 2007 through October 2007" because Kmart "had not tendered its defense."[131] Since there is no evidence in the record that Liberty contacted Kmart before Liberty's February 2008 denial letter, the Court will deem Kmart's statement as true.  It is undisputed that Kmart defended itself in the Patrick Lawsuit by conducting discovery and taking depositions.

---

[124]*Id.* at 2.

[125]*See id.*

[126]KSOF ¶ 71; LRESP ¶ 71.

[127]LRESP ¶ 71.

[128]*See* KSOF ¶ 71; FRESP ¶ 71; LRESP ¶ 71.

[129]*See* KSOF ¶ 61.

[130]FRESP ¶ 61.

[131]LRESP ¶ 61.

## I.      Kmart Settles the Patrick Lawsuit

On September 26, 2008, the parties to the Patrick Lawsuit attended a mediation.[132]  Marcia Kaiser and defense counsel Jacey Kaps represented Kmart.[133]  Richard Llerena and Maria Dantes Sanchez represented Footstar.[134]  The plaintiffs' initial demand was $695,000.00 and Kmart's initial offer was $50,000.00.[135]  Liberty admits it refused to contribute anything to settlement because it believed Footstar had no liability exposure.[136]  The plaintiffs' final demand was $595,000.00, and Kmart's final offer at the mediation was $90,000.00.[137]  The mediator informed Kmart that the plaintiffs would likely settle the case for $350,000.00.[138]  Later, Sedgwick's claims handler, Darcel McCarthy, contacted Liberty's claims handler, Patricia Aurichio, and informed her of Kmart's attempts to settle the litigation.[139]  Ms. Aurichio refused to contribute to the settlement, but did not object to Kmart settling the case.[140]

On October 28, 2008, Kmart settled the lawsuit by paying the Patricks $300,000.00 plus a $10,000 Kmart gift card.[141]  Kmart also incurred $141,755.92 in attorneys' fees and costs in defending the Patrick Lawsuit, and paid them after determining that they were reasonable.[142]  It is undisputed that Judy Patrick required multiple surgeries as a result of her injuries and that, by the

---

[132]KSOF ¶ 97; FRESP ¶ 97, dkt. 208, ex. 24, answers 13 - 14.

[133]*Id.*

[134]*Id.*

[135]KSOF ¶ 109; FRESP ¶ 109, dkt. 208, ex. 15.

[136]KSOF ¶ 99; FRESP ¶ 99; dkt. 208, ex. 19 at tr. 88:21 - 89:20, 90:7-23.

[137]*Id.*

[138]KSOF ¶ 110; FRESP ¶ 110; dkt. 208, ex. 15, 24, 25.

[139]KSOF ¶ 100; FRESP ¶ 100; dkt. 208, ex. 19 at tr. 142:16 - 143:6.

[140]*Id.*

[141]KSOF ¶ 102; FRESP ¶ 102; LRESP ¶ 102; dkt. 208, exs. 15, 25, 40, 40A.

[142]KSOF ¶¶ 102, 103; FRESP ¶¶ 102, 103; LRESP ¶¶ 102, 103; dkt. 208, exs. 15, 25, 40, 40A.

time of settlement, her medical expenses had exceeded $246,000.00.[143] In addition to this, Liberty's own defense counsel estimated another $50,000.00 to $60,000.00 in future expenses.[144] Consequently, Mr. Llerena estimated the upper end of a probable verdict at $600,000.00.[145]

Liberty admits that it was able to perform the investigation that it wanted to perform with respect to the Patrick Lawsuit.[146] Liberty retained two independent medical examiners in connection with its defense of Footstar,[147] and admits that there were no witnesses in the Patrick Lawsuit that Kmart should have interviewed, but did not.[148] Liberty does not allege that it would have defended or indemnified Kmart in the Patrick Lawsuit had it received earlier notice of either the July 2005 incident or the Patricks' claim.[149] Further, there can be no dispute that the settlement amount was reasonable.[150]

### J.    The *Adamczyk* and *Strevanski* Cases

In Kmart's Statement of Facts, Kmart also references *Adamczyk* and *Strevanski*, two unrelated cases that required Liberty to interpret the Master Agreement.[151] Liberty has motioned to strike these statements as immaterial and irrelevant.[152] Though Kmart's statements surrounding the *Adamczyk* and *Strevanski* cases do not appear to be relevant to our inquiry here, the Court reserves ruling on Liberty's motion because these facts may prove relevant to Kmart's separate allegation

---

[143]KSOF ¶ 108; FRESP ¶ 108; LRESP ¶ 108; dkt. 208, ex. 20 at 82-83.

[144]KSOF ¶¶ 106-107; FRESP ¶¶ 106- 107; LRESP ¶¶ 106-107; dkt. 208, exs. 20, 25 at tr. 216:4-12.

[145] KSOF ¶ 108; FRESP ¶ 108; LRESP ¶ 108; dkt. 208, ex. 20 at 82-83.

[146]KSOF ¶ 86; LRESP ¶ 86; dkt. 208, ex 19 at 84:20-22.

[147]KSOF ¶ 93; LRESP ¶ 93; dkt. 208, ex. 20, pp. 80, 82, 110.

[148]KSOF ¶ 87; LRESP ¶ 87; dkt. 208, ex. 19 at 84:12-15.

[149]KSOF ¶ 114; LRESP ¶ 144; dkt. 208, ex. 1.

[150]KSOF ¶ 111; FRESP ¶ 111, dkt. 208, ex. 3.

[151]*See* KSOF ¶¶ 121 - 132.

[152]*See* LRESP ¶¶ 121 - 132.

of bad faith on behalf of Liberty.

### K.  The Relevant Contractual Provisions

The rights and responsibilities of Kmart, Footstar, and Liberty  vis-a-vis each other principally flow from the Master Agreement between Kmart and Footstar and the Policy between Footstar and Liberty, which names Kmart as an additional insured.  We now examine the relevant language of each agreement, beginning with the Master Agreement between Kmart and Footstar.

### 1.  The Master Agreement

The Master Agreement's provisions govern the relationship between Kmart and Footstar. Section 3.3 provides that Footstar "shall only have the right to sell the Licensed Footwear specified in this Agreement in the Footwear Departments and shall sell or furnish no other merchandise or services in the Stores without the prior written permission [of Kmart]."[153]  While Kmart admits that it has no knowledge of any prior instance where Kmart has asserted that Footstar breached Section 3.3 by assisting customers outside of the footwear department,[154] on April 15, 2010, Kmart alleged in its Second Amended Complaint that a Footstar employee's assistance of customers in other departments would – and during the Patrick incident actually did – constitute a breach of the Master Agreement.[155]

Without amending its complaint, Kmart now claims that, under its policies, Footstar's employees were repeatedly requested – and indeed "trained" – to assist Kmart customers in other departments "to the same extent that Kmart associates would."[156]  Kmart bases this statement on the

---

[153]Dkt. 73, ex. 1 at ¶3.3.

[154]FSOF ¶ 176; KRESP ¶ 176; dkt. 211, ex. 33, p. 20-21 at ¶¶17-18.

[155]*See* FRESP ¶¶ 20-21, dkt. 73 (Kmart's Second Amended Complaint at ¶¶ 26, 27, 58, and 59).

[156]*See* KSOF ¶ 22; FRESP ¶ 22; LRESP ¶ 22; dkt. 208, exs. 1, 2, 3, 8.

March 8, 2011 deposition testimony of Kmart's own Roberta Kaselitz, who stated that as of 1996:

> Footstar employees attended general store meetings and were included in orientation and
> training programs provided to Kmart associates, including training on safety and customer
> service. It was understood that Footstar employees would assist customers . . . to the same
> extent that a Kmart associate would, including rendering assistance to customers in other
> departments if necessary . . . . Kmart associates and Footstar employees were trained that if
> a customer needed assistance in a department other than [the associate's assigned]
> department, the associate was to first locate the associate assigned to the appropriate
> department to assist the customer. However, if the associate assigned to that department
> could not be located . . . the associate/employee was trained to assist the customer.[157]

Liberty denies Kmart's allegation, asserting that "[i]n fact a Footstar employee could not assist a

Kmart customer in other store departments outside the footwear department without Kmart's prior

written permission."[158] Footstar contends that Kmart's amended pleading places the issue "in

dispute," because Kmart "judicially admitted that Footstar was required to receive written

permission for its employees to furnish any services . . . outside of the boundaries of the Footwear

Department."[159] During oral argument, Kmart's counsel explained that Kmart learned of the alleged

modification after the filing of the complaint, and that Kmart's initial allegation was merely "a legal

conclusion."[160] We will address the applicability of Section 3.3. in our substantive analysis.

The Master Agreement also contains other relevant provisions. Section 12.1, entitled

"Employer Action," provides that "[n]otwithstanding . . . any other provision of [the Master

Agreement], personnel working in the Footwear Department . . . shall be employees of [Footstar]

and [Footstar] shall exercise control over such employees . . . ."[161] Further, Section 18.1 contains

---

[157]*Id.*; dkt. 208, ex. 19, tr. at 194:9-195:4; 196:-17-197:6, 197:7-198:20, 217:17-218:3, 219:23-222:9, 224:19-225:17; ex. 30 at 7.

[158]LRESP ¶¶ 20-21.

[159]FRESP ¶¶ 20-21.

[160]Dkt. 252, (transcript of 12/07/2011 hearing) at 82:6-21.

[161]Dkt. 73, ex. 1 at 37, ¶12.1.

an indemnification clause, which provides in relevant part that:

> [Footstar] shall reimburse, indemnify, defend, and hold harmless [Kmart] and its subsidiaries . . . from and against any and damage, loss, cost, expense or penalty, or any claim or action therefor, by or on behalf of any person, arising out of [Footstar's] performance or failure to perform under this Agreement and/or the Existing Master Agreement, including but not limited to, personal injury and death claims . . . ."[162]

The Master Agreement also contains notice and non-waiver clauses. The notice provision at Section 18.3 states that Kmart or Footstar "agree to timely advise the other party of any lawsuit, claim, or proceeding for which an indemnity is provided pursuant to this Agreement and to cooperate with the other in the defense or settlement of such lawsuit, claim, or proceeding."[163] Under this provision, Kmart and Footstar are also required to "keep the other party advised at all times concerning the handling of such matters and shall furnish for the other party's review and approval all proposed settlement, release or similar documents . . . if such matter involves the other party or affects its interests."[164] In addition, the non-waiver clause at Section 21.8 states in relevant part that: "[s]ilence, acquiescence or inaction shall not be deemed a waiver of any right. A waiver shall only be effective if it is in writing and signed by . . . the party to be charged."[165]

In addition to the provisions stated above, the Master Agreement at Section 18.1 also required Footstar to: (1) obtain a liability insurance policy for personal injury "arising out of or relating to the goods and services provided by [the Master Agreement]," (2) name Kmart as an additional insured, and (3) provide a copy of that insurance policy upon Kmart's request.[166] According to Kmart's risk manager, Ken Klee, Kmart would customarily obtain Certificates of

---

[162]Dkt. 73, ex. 1 at 59, ¶18.1.

[163]*Id.* at ¶ 18.3.

[164]*Id.*

[165]*Id.* at ¶21.8.

[166]*Id.* at ¶18.1.

Insurance from its vendors, and store them at corporate headquarters.[167]

Footstar and Liberty insist that the term "services," as stated in Section 18.1, is the same as the term "Services," defined under Section 2.1 as "[Footstar's] services in the operation of the applicable Footwear Department, including stocking and supplying of licensed footwear."[168] However, the Court finds that, because the term "services" in not capitalized in this provision, it should not necessarily be ascribed the same meaning as the defined term at Section 2.1.[169]

### 2.    The Policy

The Policy between Footstar and Liberty contains an indemnification clause at Paragraph D(2), which states:

> If we [Liberty] defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit," we will defend that indemnitee if all of the following conditions are met:
>
> a.    The 'suit' against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";
>
> b.    This insurance applies to such liability assumed by the insured;
>
> c.    The obligation to defend, or the cost of the defense of, that indemnitee has also been assumed by the insured in the same "insured contract";
>
> d.    The allegations in the 'suit' and the information we know about the 'occurrence' are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;
>
> e.    The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such 'suit' and agree that we can assign the same counsel to defend the insured and the indemnitee; and

---

[167]Dkt. 205, ex. 7 at 134, 179-180.

[168]Dkt. 253 at 6; FSOF ¶ 12; dkt. 73, ex. 1 at 9.

[169]*See* KRESP1 ¶ 12.

      f.      The indemnitee:

         (1) Agrees in writing to:

             (a) Cooperate with us in the investigation;

             (b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the 'suit';

             (c) Notify any other insurer whose coverage is available to the indemnitee;

             (d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

         (2)      Provide us with written authorization to:

             (a) Obtain records and other information related to the 'suit'; and

             (b) Conduct and control the defense of the indemnitee in such 'suit'[170]

"[S]o long as the above conditions are met," the Policy provides that attorneys' fees incurred by Liberty in the defense of an indemnitee and "necessary litigation expenses" will be paid up until: (a.) Liberty has "used up the applicable limit of insurance in the payment of judgments or settlements;" or "(b.) [t]he conditions set forth above, or the terms of the agreement described in Paragraph 1. above are no longer met."[171]

The Policy defines an "insured contract" as, among other things, "[t]hat part of any other contract or agreement pertaining to [Footstar's] business under which [Footstar] assume[s] the tort liability of another to pay damages because of 'personal injury' or 'property damage' to a third person or organization . . ."[172] "Personal injury" is defined as "bodily injury" (subject to certain

---

[170]Dkt. 208, ex. 8.

[171]Dkt. 208, ex. 8, ¶D(2).

[172]*Id.* at ¶D(9).

exceptions that are not at issue here).[173]

Section II of the Blanket Additional Insured Amendment also limits liability insurance to "personal injury"or "property damage" arising out of [Footstar's] "work" or "premises;" and states that it applies only "to coverage and limits of insurance required by the written agreement."[174]

## III.    SUMMARY JUDGMENT STANDARD

The construction of an insurance policy and "the determination of the rights and obligations thereunder are questions of law for the [C]ourt" which may be disposed of on summary judgment.[175] The Court will grant summary judgment under Federal Rule of Civil Procedure 56 if a party presents evidence that demonstrates the absence of a genuine issue of material fact.[176]  The party seeking summary judgment may rely on "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to show an absence of a genuine issue of material fact.[177]  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a genuine issue of material fact exists and the motion for summary judgment will be denied.[178]  Courts consider the facts in the light most favorable to non-movants, drawing all reasonable inferences in their favor.[179]

---

[173]*Id.* at ¶B(3).

[174]*See* dkt. 73, ex. 2.

[175]*Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill.2d 384, 391 (1993).

[176]*See* Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

[177]*Celotex Corp.*, 477 U.S. at 324.

[178]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986).

[179]*Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002).

## IV.    CHOICE OF LAW

The parties have stipulated that New Jersey law applies to the Policy,[180] and there appears to be no dispute that Illinois law governs the Master Agreement.[181]

## V.    DUTY TO DEFEND

Kmart would like us to find that Mr. Sehat's presence potentially caused Mrs. Patrick's accident: that his "jiggling" and "pulling" caused the infant carrier to fall, invoking Footstar and Liberty's duties to defend and indemnify pursuant, first, to the Master Agreement, and then pursuant to the Liberty Policy. Footstar's view is that regardless of Mr. Sehat's involvement, the Master Agreement was solely limited to selling shoes, so it cannot possibly cover a situation where Mr. Sehat was helping a Kmart customer in the infant department. Complicating this case further, Liberty has its own extensive set of arguments. It first asserts a notice argument: Kmart did not ask for a defense and indemnification directly from Liberty, so it cannot do so now. Liberty next claims that a comparison of Mrs. Patrick's amended complaint, the Master Agreement, and the Liberty Policy shows that Mrs. Patrick pleaded facts that fall outside of the Policy language. The Policy addresses Footstar's "work" and Footstar's "premises." Liberty argues that Mrs. Patrick's accident arose from Kmart's goods (the infant carrier) and Kmart's services (its failure to secure the infant carrier), not those of Footstar.

To determine whether Footstar, and thereby Liberty, were required to provide a defense to Kmart we look first to the agreement between the parties, and then to the allegations in the complaint and the facts known to both Footstar and Liberty at the time. The Master Agreement

---

[180]*See* dkt. 201.

[181]*See* dkt. 208 at 3, fn 2.

provides that Footstar, through its insurer, will defend Kmart for any "damage, loss," or "claim...arising out of [Footstar's] performance or failure to perform under the [Master Agreement]."[182] In line with that agreement, Footstar's insurance policy through Liberty covers Kmart as an additional insured, stating that any organization "for whom you have agreed in writing to provide liability insurance" is included.[183] The Policy specifies that this coverage "[a]pplies only to 'personal injury' or 'property damage' arising out of (a) 'your work' or (b) premises or other property owned by or rented to you..."[184]

### A.    Footstar

Footstar argues that Kmart cannot tie Mrs. Patrick's lawsuit to Mr. Sehat, wherever he may have been and whatever he may have been doing. Even if he were at fault, Footstar claims that because he was not performing any aspect of Footstar's obligations under the Master Agreement, the duty to defend would not extend. Specifically, Footstar claims that its performance was limited to selling shoes in the Kmart footwear departments. It, therefore, argues that Mrs. Patrick's accident did not "arise out of" Footstar's performance, or failure to perform. But Kmart asserts that Footstar had control over Mr. Sehat, so it did "arise out of" Footstar's performance or failure to perform. Put another way, Kmart asserts that Footstar can only perform or fail to perform through its employees whether that be in, or outside of, the footwear department.

Courts look first to the allegations of the underlying complaints to determine an insurer's duty to defend.[185] "If the underlying complaints allege facts within or potentially within policy

---

[182]Dkt. 208, ex. 7.

[183]Dkt. 208, ex. 8 at 11.

[184]*Id.*

[185]*Am. Econ. Ins. Co. v. DePaul University,* 383 Ill.App.3d 172, 178, 890 N.E.2d 582, 588, 321 Ill.Dec. 860, 866 (Ill.App. 1st Dist., 2008).

coverage, the insurer is obliged to defend its insured even if the allegations are groundless, false, or fraudulent."[186] But here we address an indemnitor's duty to defend an indemnitee. This duty is similar to an insurer's duty to defend an insured, except that an indemnitor may independently investigate to determine whether the facts fall within the relevant indemnity provision.[187] In this case, Footstar was not limited by the allegations of Mrs. Patrick's complaint in determining if it had a duty to defend under the indemnity provision of the Master Agreement. If, despite the allegations of Mrs. Patrick's complaint, the facts clearly showed that there was no "damage, loss...claim or action...arising out of [Footstar's] performance or failure to perform," then Footstar would not have a duty to defend Kmart.[188] But an indemnitor must have a good faith factual basis for denying coverage.[189]

It is important to note here that the "strict construction" rule for indemnification provisions, which Footstar repeatedly cites, "only [applies] where the indemnification is designed to protect one from his or her own negligence or conduct."[190] Because the Master Agreement is not so designed, as discussed below, the strict construction rule is inapplicable.

First, we look to the complaint's allegations. The Patricks alleged that Footstar "did negligently and carelessly, own, operate, maintain and control" the premises by "failing to properly remove the merchandise" and "failing to provide adequate warnings" regarding the unsafe conditions.[191] Kmart notes that Illinois courts interpret the "arising out of" language broadly to mean

---

[186] *Am. Econ. Ins. Co.,* 383 Ill.App.3d at 178, 890 N.E.2d at 588, 321 Ill.Dec. at 866.

[187] *Applied Indus. Materials Corp. v. Mallinckrodt, Inc.,* 102 F.Supp.2d 934, 942 (N.D. Ill. 2000).

[188] *See Sears, Roebuck and Co. v. Savoy Reinsurance Co., Ltd.,* No. 90-1202, 1991 WL 22501, *4 (N.D.Ill. Feb. 15, 1991).

[189] *Applied Indus. Materials Corp. v. Mallinckrodt, Inc.,* 102 F.Supp.2d 934, 942 (N.D. Ill. 2000).

[190] *Mallinckrodt, Inc.,* 102 F.Supp.2d at 943 (internal citations omitted).

[191] Dkt. 208, ex. 12 at ¶23.

"but for" causation, not necessarily "proximate causation."[192]  And "arising out of" can mean conduct "originating from," "growing out of," or "connected with" the activity in question.[193] So if Mrs. Patrick's injuries were "connected with" or grew out of Footstar's action, or its performance or lack thereof, then Footstar had a duty to defend.

But Footstar argues that Kmart's negligence is the root of the Patrick complaint, claiming that the complaint "exonerates" both Mr. Sehat and Ms. Hohney because it does not specifically allege that they "or any other individual" was negligent in attempting to remove the stroller.[194] Footstar's argument ignores  the obvious fact that the complaint could not "exonerate" Mr. Sehat if it alleges a separate count of negligence against Footstar for "failing to properly remove the merchandise" from the overhead shelf, and "failing to warn" of the risk created. These allegations implicate the conduct of Mr. Sehat, the only employee the Patricks alleged attempted to bring down the stroller. If anything, the complaint's allegations implicate both Kmart and Footstar equally: Kmart for negligently stocking the merchandise, and Footstar for negligently removing it.  Though there is one negligence count against each company, the separation is not perfect. The Patricks also made  "failure to properly remove" and "failure to warn" allegations against Kmart. Again, if these allegations "arise out of" the "acts or omissions" of a Footstar employee, they trigger the Master Agreement's defense provision.

The complaint's allegations certainly fall within that rubric: Mrs. Patrick's injuries were connected to the alleged action, or inaction, by Mr. Sehat. This is the result whether he was supposed to be performing duties outside the footwear department, or whether he was not. Both

---

[192]*Am. Econ. Ins. Co.,* 383 Ill.App.3d at 178, 890 N.E.2d at 588, 321 Ill.Dec. at 866.

[193]*Id.*

[194]Dkt. 220 at 5. It should be noted that Liberty makes this same argument.

possibilities arguably lead to an injury that was connected to the "performance" by Footstar, or its "failure to perform" through its employee. (Below we address Footstar's argument that Kmart is bound by its allegation that employees were not allowed to assist outside of the footwear department, or, that Footstar violated the Master Agreement when Mr. Sehat assisted Mrs. Patrick in the infant department).

But Footstar, as the indemnitor, may look beyond Mrs. Patrick's allegations and investigate whether the facts support a duty to indemnify.[195] A review of the testimony evinces the potential for coverage. Mr. Sehat testified that Mrs. Patrick was the one who pulled on the stroller that inevitably came loose and fell on her, not him.[196] And Ms. Hohney corroborated that same account of the incident in her testimony.[197] Mrs. Patrick, however, testified that Mr. Sehat was trying to get the stroller's wheels untangled and "that's when the other one fell," hitting her on the head.[198] Her daughter, Tina Patrick, corroborated this account, stating that Mr. Sehat "started to jiggle with it, to get the wheels unlocked," just before the infant carrier fell, hitting her mother who was standing next to him.[199]

If we look to what Footstar knew at the time, the same factual uncertainties are present. Footstar immediately turned the investigation over to Liberty when, on June 6, 2007, Footstar became aware that a Footstar employee had been "helping [Judy Patrick] at the time of the incident," and reported the "incident" to Liberty.[200] On June 7, 2007, a claims handler from Liberty recorded

---

[195]*See Sears, Roebuck and Co.,* No. 90-1202, 1991 WL 22501, *4.

[196]Sehat Dep., p. 34, dkt. 215-51, ex. 35(E).

[197]Hohney Dep., p. 12, dkt. 215-52, ex. 35(F).

[198]Judy Patrick Dep., p. 130-33, dkt. 215-49, ex. 35(C).

[199]Tina Patrick Dep., p. 50, dkt. 215-50, ex. 35(D).

[200]SOF 45-47; dkt.238, SOF 45-47.

that "[t]here is apparently a lawsuit filed against Kmart in which Footstar is not yet a party to [sic].
It appears an employee of the insured was assisting a customer when a box fell upon the
claimant."[201]  The handler went on to write "we need to establish what caused the box to fall[.]"[202]
Four months later, on October 19, 2007, a Liberty claims handler recorded that, during a June 7,
2007 interview, Mr. Sehat "had indicated" that Mrs. Patrick was trying to pull down the stroller
herself when the infant carrier fell on her head.[203] The handler noted that "[a]t this point there is no
claim against Footstar . . . Customer wants us to keep a low profile."[204]  On February 1, 2008, the
Patricks amended their complaint by naming Footstar and providing detailed factual allegations,
including that Mr. Sehat had attempted to bring down the stroller when the infant carrier fell.

A look at the facts beyond the allegations - both through testimony and what Footstar and
Liberty knew - does not change the outcome. Mr. Sehat and Ms. Hohney claim that Mrs. Patrick
caused the infant carrier to fall. But Mrs. Patrick and her daughter testified to the opposite, that it
was only after Mr. Sehat's "jiggling" of the strollers that the infant carrier fell. And Liberty's own
claims handler noted the same uncertainty. The facts, therefore, do not show that Footstar
"indisputably" had no causal connection to Mrs. Patrick's injury.[205] Even if liability was ultimately
based only on Kmart's actions, as Footstar would like us to believe (Kmart alone was responsible
for leaving its merchandise in an unsafe condition), Footstar would still have a duty to defend to the
extent that there exist claims that Footstar potentially caused the accident.

---

[201]SOF 52; dkt. 238, SOF 52; dkt. 215, ex. 20, Liberty Mutual Claim Notes, pp. 129, 139.

[202]Dkt. 215, ex. 20 at 139.

[203]*Id.* at 129.

[204]*Id.*

[205]*See Sears, Roebuck and Co.,* No. 90-1202, 1991 WL 22501, *4 (stating that the facts did not "indisputably
show whether the injury was caused by a construction or design defect.").

### B.     Liberty

We next turn to Liberty's arguments with respect to the duty to defend. Liberty agrees that its Blanket Additional Insured Amendment in the Policy tracks the Master Agreement: it provides Kmart coverage as "required by the written contract."[206] The insurance provision in the Master Agreement provides that Footstar will obtain insurance for Kmart, naming Kmart as the additional insured on Footstar's Policy, "for claims against [Kmart] and [Footstar] for personal injury (including death) and property damage arising out of or relating to the goods and services provided pursuant to this Agreement..."[207] The Liberty Policy, then, covers Kmart as an additional insured, with coverage that "[a]pplies only to 'personal injury' or 'property damage' arising out of (a) 'your work' or (b) premises or other property owned by or rented to you..."[208]

Under New Jersey law, like Illinois, the duty to defend is a more liberal standard than that governing indemnity, invoked if the insurer knows "facts indicating *potential* coverage."[209] If either the facts known to the insurer or the allegations in the complaint correspond with the policy language, "the duty to defend arises, irrespective of the claim's actual merit."[210] In other words, in a duty to defend analysis it is irrelevant that the claims may be "poorly developed" or are "sure to fail," because "'[l]iability of the insured to the plaintiff is not the criterion; it is the allegation in the complaint of a cause of action which, if sustained, will impose a liability covered by the policy.'"[211] An insurer, therefore, may have a duty to defend its insured even if it is ultimately not liable to

---

[206]Liberty Policy at 11; dkt. 215-8, ex. 8.

[207]Master Agreement, p. 42, Kmart's Exhibits, dkt. 215-7, ex. 7.

[208]Liberty Policy at 11; dkt. 215-8, ex. 8.

[209]*SL Indus., Inc. v. Am. Motorists Ins. Co.*, 128 N.J 188, 198 (N.J. 1992) (emphasis added).

[210]*Voorhees v. Preferred Mut. Ins. Co.,* 128 N.J. 165, 173 (1992).

[211]*Voorhees,* 128 N.J. at 174 (quoting *Danek v. Hommer,* 28 N.J. Super. 68, 77 (App. Div. 1953)).

indemnify the insured.[212] And any ambiguities are to be resolved in favor of coverage.[213]

Liberty provides the broad sweeping argument that no defense was owed in this case because the amended complaint showed no possibility of additional insured coverage. Liberty then refers the Court to several cases that govern when an insurer has a duty to defend its insured. As noted, Liberty acknowledges that its Blanket Additional Insured Amendment in the Policy tracks the Master Agreement. Liberty simply argues here that the allegations in the amended complaint fall outside of the meaning of "arising out of" Footstar's "goods and services" or "work."

We first take issue with Liberty's definition of "services." Liberty argues that the term "services," as written in this provision, is the same as the capitalized term "Services," as defined under Section 2.1. The definition of "Services" is "the Licensee's services in the operation of the applicable Footwear Department, including stocking and supplying of licensed footwear."[214] But we agree with Kmart that because the term "services" in not capitalized in the indemnification provision, it should not be ascribed the same meaning as the defined term contained in Section 2.1.[215]

Regarding the Master Agreement's "arising out of" language, we have already found that it must be interpreted in a comprehensive sense to mean conduct "originating from," "growing out of," or "connected with" the activity in question.[216] The amended complaint sufficiently creates a substantial nexus between Mrs. Patrick's injuries and Mr. Sehat's actions; her injury was arguably "connected with" or grew out of Footstar's "work," or its performance or lack thereof. For purposes of the duty to defend, then, the accident could have been caused by the "work" of Footstar because

---

[212]*Voorhees v. Preferred Mut. Ins. Co.*, 607 A.2d 1255, 1259 (N.J. 1992).

[213]*Flomerfelt v. Cardiello*, 997 A.2d 991, 998 (N.J. 2010); *Wilkin Insulation*, 578 N.E.2d at 930.

[214]Master Agreement at 9, dkt. 73, ex. 1; Liberty's Resp. at 6; FSOF ¶ 12.

[215] *See* KRESP1 ¶ 12.

[216]*See Am. Econ. Ins. Co.*, 383 Ill.App.3d at 178.

the Policy covers Kmart as an additional insured, in that it applies "to 'personal injury' or 'property damage' arising out of (a) '[Footstar's] work'."[217]

In lieu of addressing all of Liberty's case references, which arguably all demonstrate when coverage is properly denied, we highlight one in particular. In *SL Industries, Inc. v. American Motorists Insurance Co.* the court held that the insurance policy did not cover claims for emotional pain and suffering but found that facts outside of the complaint could trigger a duty to defend.[218]The court made the distinction that the insurer's decision not to defend based on the complaint was appropriate, but recognized the relevance of the "after-acquired information to the duty to defend."[219]

In comparing *SL Industries* to this case, Liberty asks whether Mrs. Patrick's accident arose out of Footstar's "goods, services or work" in the operation of the Footstar footwear department. This is where Liberty is short sighted. As we have addressed, the language in the Master Agreement, and the Policy (which insures any "organization" for whom Footstar has "agreed in writing to provide liability insurance"), cannot be read so narrowly. The question is not whether the accident arose from work in the footwear department but, rather, whether the accident arose out of Footstar's "work." We found that it potentially did.

Contrary to Liberty's purpose, we find that the cases it has cited are more helpful in supporting a duty to defend than not. The basic question is whether the insurer knows facts indicating a *potential* for coverage. When the complaint was amended to add Footstar, the

---

[217]Liberty Policy at 11; dkt. 215-8, ex. 8.

[218]*SL Industries,Inc.,* 128 N.J at 199.

[219]*See Abouzaid v. Mansard Gardens Associates, LLC.,* 207 N.J. 67, 86 (2011) (analyzing the *SL Industries* case).

allegations were that Footstar "did negligently and carelessly, own, operate, maintain and control" the premises by "failing to properly remove the merchandise" and "failing to provide adequate warnings" regarding the unsafe conditions.[220] We have strained to understand Liberty's position that this falls outside of Footstar's work simply because Mr. Sehat was in the infant department. For purposes of indemnity, that may be. But for purposes of a duty to defend, even a claim "that is sure to fail" may require a defense because actual liability "is not the criterion."[221] "A complaint need only apprise the opposing party of disputed claims and issues,"[222] and here the dispute, as acknowledged by all parties, was whether Mr. Sehat, performing as Footstar employee, potentially caused the infant carrier to fall on Mrs. Patrick.

## C. Defense Costs

This brings us to our next question: whether Kmart can be reimbursed for previously-expended defense costs prior to its formal request for coverage on January 24, 2008. We ask this question because there were facts known to Footstar and Liberty prior to that date that could potentially trigger a duty to defend.[223] Many of the cases so ardently relied on by Liberty are more appropriate for this analysis. For example, Liberty cites a particular holding outlined in *SL Industries* that we find useful here, providing that,

> [i]ndeed, at the time SL Industries forwarded the complaint to [the insurer], neither SL Industries nor [the insurer] was aware that Whitcomb had suffered any emotional distress. Because the complaint contained the only information [the insurer] had about the underlying suit, and because the complaint did not allege any covered injuries triggering the duty to defend,[the insurer's] May 1986 decision not to defend

---

[220]Amended Compl. at ¶23, dkt. 215-12, ex. 12.

[221]*Voorhees*, 607 A.2d at 1259.

[222]*Id.*

[223]*See Abouzaid,* 207 N.J. at 86 (recognizing that facts outside of the complaint can trigger a duty to defend, separate and apart from the date the complaint is filed).

the action was appropriate. However, by June 1986 SL Industries had learned of additional facts that potentially triggered [the insurer's]duty to defend.[224]

Here, we know that long before the Patricks formally amended their complaint Footstar and Liberty knew that Mr. Sehat was involved in some way, and that his involvement could result in Footstar being brought into the suit. Liberty's claim notes state as much, when, in June 2007, Liberty documented in its files that Mr. Sehat had assisted Mrs. Patrick, that Footstar was "not yet a party in this case," and that the "[c]ustomer does not want us to make contact" with Mrs. Patrick's attorney.[225] Liberty also interviewed Mr. Sehat and noted that he, in fact, did not know who "was pulling the box at the time" that Mrs. Patrick was injured.[226] Under our analysis, the potential for coverage was already surfacing at that time.

It is worth mentioning, at this juncture, the true-but-upleaded-facts doctrine. Much like what we have already discussed, this doctrine simply refers to the general rule that a court may consider evidence beyond the underlying complaint to determine whether a duty to defend exists, as long as doing so does not determine an issue critical to the underlying case.[227] Illinois courts have clarified, however, that not just any material outside of the underlying pleadings is considered. An insurer is not required to act on "extraneous facts the insurer possessed" that were only "supplied by the insured."[228] For the insurer to know if the facts are true, it must conduct its own investigation. The doctrine is applied to show an insurer's duty to defend, then, where the extraneous facts that support the duty to defend are those the "'insurer discovered during its own investigation of the underlying

---

[224]*SL Industries, Inc.,* 128 N.J. at 198.

[225]KSOF ¶ 54, dkt. 208, ex. 20 at 115.

[226]Dkt. 208, ex. 20 at 138.

[227]*Pekin Ins. Co. v. Precision Dose, Inc.,* 2012 Ill.App.2d. 110195, *15 (Ill.App., 2nd Dist. 2012).

[228]*Pekin Ins. Co.,* 2012 Ill.App.2d. 110195 at *17.

action.'"[229]

In this case there would seem to be no conflict with the application of the doctrine. Footstar informed its insurer, Liberty, when it learned of Mrs. Patrick's incident, and Liberty immediately investigated and verified the information itself. Liberty interviewed Mr. Sehat and learned that Footstar could be liable, and that there could possibly be a claim coming from Kmart as well. Even so, Liberty chose to "not make contact" but to keep a low profile while the Patrick case continued forward. Despite Liberty and Footstar citing to this doctrine, it does not, in our view, strengthen their position. We have already determined that a duty to defend arose from the amended complaint on its face, and the extraneous facts we have cited to here to support what Liberty and Footstar knew at the time were those discovered by Liberty itself, in its own investigation.

But as we note later in this opinion, in more detail, all parties make claims of late notice and estoppel. Everyone in this case, to a certain degree, is responsible for why it took so long to get all parties at issue. We, therefore, decline Kmart's invitation to award defense costs beginning in June 2008, when Liberty first learned of the potential for coverage. The delays are attributable to all involved, so the more appropriate date from which to calculate defense costs is the date Kmart formally requested coverage, and was thereafter denied, January 24, 2008.

## VI.    DUTY TO INDEMNIFY

Unlike the duty to defend, the duty to indemnify is not based on the allegations in the complaint, but upon the adjudicated facts of the underlying lawsuit as they are determined.[230] Thus,

---

[229] *Id.*

[230] *See Bd. of Trustees, Vill. of Bolingbrook Police Pension Fund v. Underwood, Neuhaus & Co., Inc.*, 742 F.Supp. 984, 989 (N.D. Ill. 1990) (finding that the Illinois Supreme Court "has clearly stated that an action for indemnification is premature while the underlying action is pending if the indemnity decision would require a court to adjudicate facts in the underlying dispute.").

a duty to indemnify does not necessarily follow from a duty to defend.

## A. The Language of the Master Agreement

Kmart argues that the plain language of the Master Agreement indemnifies Kmart for its own negligence, and that Footstar is estopped from challenging Kmart's interpretation.[231] When determining the intent of the parties with respect to indemnity coverage, each individual case "depends upon the particular language used [in the agreement] and the factual setting of the case."[232] Here, the indemnification provision at Section 18.1 provides in relevant part that:

> [Footstar] shall reimburse, indemnify, defend, and hold harmless Licensor [Kmart] and its subsidiaries . . . from and against any and all damage, loss, cost, expense or penalty, or any claim or action therefor . . . arising out of [Footstar's] performance or failure to perform under this Agreement and/or the Existing Master Agreement, including but not limited to, personal injury and death claims . . . ."[233]

Section 12.1, entitled "Employer Action," also provides that Footstar "shall exercise control" over the "work procedures" of its employees and "shall reimburse, indemnify, defend and hold [Kmart] harmless" from "any and all" claims "arising out of Footstar's 'Employer Action.'"[234]

Kmart asserts that the "any and all" language is "inclusive and unlimited in scope" and that "[t]here is no limitation on Footstar's obligation to indemnify Kmart."[235] Footstar, however, contends that the provision contains "limiting language" in the phrase "[Footstar's] performance or failure to perform,"[236] and thus any subject outside of Footstar's own performance cannot serve as a basis for indemnification.[237]

---

[231]Dkt 209 at 10 - 14.

[232]*Zadak v. Cannon*, 59 Ill.2d 118, 121 (1974).

[233]Dkt. 73, ex. 1 at 59, ¶18.1.

[234]*Id.* at ¶18.3

[235]Dkt. 209 at 10-11.

[236]Dkt. 220 at 8.

[237]*Id.*

Agreements purporting to indemnify an indemnitee for its own negligence are permitted in Illinois, but they are "not favored" and will thus be "strictly construed against the indemnitee."[238] Generally, Illinois courts require "clear and explicit language," expressing the desire for this type of indemnification in "unequivocal terms."[239] As the Illinois Supreme Court has observed, indemnifying another for its own negligence is "so hazardous," that there should be "no presumption that the indemnor intended to assume the responsibility."[240] The Master Agreement's indemnification clause contains the broad and sweeping language "any and all," as well as the inclusive phrase "arising out of."[241] However, the provision then limits indemnification to liability arising out of "[Footstar's] performance or failure to perform."[242]

While the differing language of individual indemnification clauses has long frustrated efforts to reconcile the numerous Illinois cases interpreting them,[243] one clear pattern appears to have emerged: where a limiting clause refers back to the indemnitor's own "acts or omissions" in the "performance of the work" or the like, and contains no reference to the indemnitee, Illinois Courts have regularly held that the indemnitee is not covered for his own negligence.[244] As stated in *Buenz*

---

[238]*See Church v. General Motors Corp.*, 74 F.3d 795, 799 (7th Cir. 1996).

[239]*Buenz v. Frontline Transportation Co.*, 882 N.E.2d 525, 533 (Ill. 2008), quoting *Westinghouse Elec. Elevator Co. v. La Salle Monroe Bldg. Corp.*, 70 N.E.2d 604, 607 (Ill. 1946).

[240]*Westinghouse*, 70 N.E.2d at 607.

[241]*See* dkt 73 ex 1 at 59, par 18.1

[242]*See id.*

[243]*See Concast, Inc. v. AMCA Sys., Inc.* 959 F.2d 631, 633 (7th Cir. 1992) (stating that text of indemnification clause "has no litigated antecedent," therefore "little purpose would be served by discussing other cases . . .").

[244] *See, e.g., Virginia Sur. Co., Inc. v. Northern Ins. Co. of New York*, 866 N.E.2d 149, 151, 158-59 (Ill. 2007); *Westinghouse*, 70 N.E.2d at 607; *see also Tatar v. Maxon Construction Co.*, 54 Ill.2d 64, 66 (1973) (finding indemnitee's own negligence not indemnified where clause covered "'all expenses, claims, suits, or judgments . . . by reason of, arising out of, or connected with, accidents, injuries, or damages, which may occur upon or about the Subcontractor's work'"); *Zadak v. Cannon*, 59 Ill.2d 118, 121 (1974) (finding no indemnity for indemnitee's own negligence where language referred to "claims 'arising out of any such work'-'such work' being that performed by [indemnitor's] employees under the contract"); *compare Econ. Mech. Ind., Inc. v. T.J. Higgins Co.*, 294 Ill.App.3d 150, 155 (1997) (finding indemnitee's own negligence was covered by contract language which provided that "[indemnitor] will at all times protect, indemnify and save and keep harmless the [indemnitee] against and from any and all loss, cost, damage

*v. Frontline Transportation Co.*, "when an indemnity contract expressly limits itself to the negligence of the indemnitor, [Illinois] courts will not strain, simply because the contract . . . contains 'any and all' language, to read into that contract indemnification for an indemnitee's own negligence."[245] .

Kmart makes the contextual argument that Footstar expected its employees to assist Kmart customers in other departments "in the same way that Kmart associates would," and therefore Footstar accepted the possibility that a covered injury could arise from both Kmart's negligence and Footstar's performance.[246] However, Section 3.3 of the Master Agreement expressly limits the work of Footstar employees to the Footwear Department under ordinary circumstances. It states in pertinent part that "[Footstar] shall have the right to sell only the Licensed Footwear specified in this Agreement in the Footwear Departments, and shall sell or furnish no other merchandise or services in the Stores without prior written permission of [Kmart]."[247] As Footstar observes, Kmart pled that, at the time of Mrs. Patrick's injury, Kmart had not given Footstar prior written permission "to furnish any services . . . outside the boundaries of the 'Footwear Department,'" and therefore Footstar's assistance of customers outside the Footwear Department violated Section 3.3 of the Master Agreement.[248]

Footstar agues that Kmart is now bound by its allegations, and cannot claim that Footstar employees were expected to assist customers in other departments.[249] Kmart responds that its

---

or expense, arising out of or from any accident or other occurrence." (emphasis omitted)).

[245]*Buenz*, 882 N.E.2d at 533; *see Westinghouse*, 70 N.E.2d at 607.

[246]Dkt. 209 at 4, 13.

[247]Dkt. 73, ex. 1 at Section 3.3.

[248]Dkt. 73, ¶¶ 26, 27, 58, 59.

[249]Dkt. 254 at 2-3.

allegations are not binding judicial admissions of fact[250] – which would have the effect of removing the issues from dispute[251] – but are legal conclusions about the operation of the contract (which is an issue for the Court to decide)[252] Kmart relies on *McCaskill v. SCI Management Corp.* to support its proposition.[253] However, *McCaskill* is distinguishable because it dealt only with an attorney's oral statements, holding that "[t]he scope of a judicial admission by counsel is restricted to unequivocal statements as to matters of fact . . . [and] does not extend to counsel's statement of his conception of the legal theory of a case."[254]

The allegations in Kmart's amended pleading are more analogous to those in *Soo Line R. Co. v. St. Louis Southwestern Ry. Co.* ('SSW'), which were determined to be judicial admissions.[255] There, the Court prevented plaintiff, the Soo, from denying that it sought recovery for work it had performed under a contract with defendant, SSW, because the Soo had alleged in its amended complaint that: "'the contract called for the Soo 'to be compensated for services its agents performed' . . . [the Soo] 'provid[ed] the services' . . . [and] SSW 'refus[ed] to fully compensate the Soo. . . .'"[256] While the Soo's judicial admissions dealt with factual matters, they also described the operation of a contractual provision.[257] The same was true in *Help At Home Inc. v. Medical Capital, LLC*, where the Seventh Circuit upheld the district court's determination that a plaintiff had

---

[250]"A judicial admission is binding upon the party making it; it may not be controverted at trial or on appeal of the same case." 30B FED.PRAC.& PROC.EVID.(Interim ed.) § 7026 (2002).

[251]*Keller v. U.S.*, 58 F.3d 1194, 1198 (7th Cir. 1995).

[252]*See* dkt. 228 at 6; *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008)(observing that, "[u]nder Illinois law, the interpretation of a contract presents a question of law that is decided by the court").

[253]*See McCaskill v. SCI Management Corp.* 298 F.3d 677, 681 (7th Cir. 2002) (Rovner, J., concurring).

[254]298 F.3d 677 at 681-82 (Rovner, J., concurring), quoting 30B FED.PRAC.& PROC.EVID. (Interim ed.) § 7026 (2002).

[255]*See Soo Line R. Co. v. St. Louis Southwestern Ry. Co.*,125 F.3d 481, 483 (7th Cir. 1997)

[256]*Id.* (holding that plaintiff's allegations were judicial admissions).

[257]*See id.*

42

judicially admitted that an agreement was a "loan," simply by labeling it as such in the pleadings.[258]

Here, the Court need not decide whether a judicial admission was made when Kmart alleged that Section 3.3 required "prior written permission" for Footstar employees to assist Kmart customers outside the Footwear Department.[259] Whether the Court deems Kmart to have judicially admitted this, or simply interprets Section 3.3 based on its plain and unambiguous language, the result is the same: prior written permission from Kmart was clearly required by the terms of the Master Agreement.[260] Kmart has argued that Section 3.3 was orally modified in 1996, in order to allow Footstar "to provide services to customers in areas of Kmart stores other than the footwear departments."[261] However, Kmart's argument on this point is unpersuasive.

The Master Agreement contains explicit provisions prohibiting oral modification. The agreement provides: (1) that it "may only be amended or modified by written instrument signed by authorized officers of the parties,"[262] (2) that "[s]ilence, acquiescence or inaction shall not be deemed a waiver of any right," and (3) that "[a] waiver shall only be effective if it is in writing . . . ."[263] Non-waiver provisions are enforceable in Illinois "and may be strictly construed even when full compliance with the contract has not been required for a lengthy period of time."[264] To overcome contractual language through "words and deeds," Kmart must provide "clear and convincing

---

[258] *Help At Home Inc. v. Medical Capital, LLC*, 260 F.3d 748, 753 (7th Cir. 2001).

[259] The Court also notes that it is undisputed that Footstar did not receive written permission from Kmart to operate outside of the Footwear department.

[260] *See* dkt. 73, ex. 1 at Section 3.3.

[261] Dkt. 228 at 4.

[262] Dkt. 208, ex. 5 at 34, ¶17.10; ex. 7 at 48, ¶ 21.10.

[263] Dkt. 71, ex. 1 at ¶21.8.

[264] *Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 78 F.3d 266, 277 (7th Cir. 1996); citing *Transcraft Corp. v. Anna Indus. Dev. Corp.*, 584 N.E.2d 1033, 1035 (1991) (finding non-waiver clause remained binding even though contract was breached continuously for over twenty years).

evidence [of modification]."[265]

Kmart has failed to provide such evidence. Kmart relies only on the deposition testimony of Roberta Kaselitz[266] and Footstar's tacit recognition of the substance of her testimony.[267] Yet, nothing in Ms. Kaselitz's testimony suggests that she had intended to modify – or was even aware of – Kmart and Footstar's relationship under the Master Agreement.[268] In fact, Ms. Kaselitz repeatedly testified that there was no specific written document outlining Footstar's customer service duties.[269] Further, though Ms. Kaslitz testified that un-named Meldisco employees orally agreed with Kmart in "1996/1997" that "Meldisco [Footstar] employees should be treated like any other [Kmart] associate,"[270] the language of Section 3.3. remained unaltered between the 1995 Master Agreement and its 2005 Amendment and Restatement.[271]

Further, Kmart does not explain how the alleged modification – which would have only expanded the duties of Footstar employees and increased their exposure to liability – conferred a benefit upon Footstar.[272] A contract modification generally requires new consideration,[273] expect in the case of unilateral waivers. Even if Kmart had at some point orally waived Section 3.3, this

---

[265]*Id.*

[266]*See* dkt. 208, ex. 9, tr. at 194:9 - 195:4; 196:17 - 197:6; 197:7 - 198:20; 217:17- 218:3, 218:23 - 229:9, 224:19-225:17.

[267] *See* dkt. 208, ex. 30, ans. 7 ("Footstar is generally aware of an understanding with Kmart that if a customer outside the footwear department was palpably in need of assistance, an employee in the footwear department was permitted to assist . . . .Whether and to what extent that this understanding was based upon documents, oral statements . . . non-verbal communications, generally accepted principles of Good Samaritanship, basic human morality, or other sources, is the subject of continuing investigation").

[268]*See* dkt. 218, ex. 24, tr. at 82:19 - 83:21.

[269]Dkt. 208, ex. 9, tr. at 196:6-196:10; 196:22 - 23;

[270]*Id.* tr at 252:12 - 253:5.

[271]*See* ¶3.3 of dkt. 208, exs. 5, 7.

[272]*See* dkt. 228 at 4-5.

[273]A contract modification must satisfy all the criteria of a valid contract, including offer, acceptance, and consideration. *Swinder v. Austin Bank of Chicago*, 809 N.E.2d 180, 189 (Ill.App.1st Dist.2004).

does not necessarily mean that Footstar agreed to assumed liability for Kmart's negligence.[274] As Footstar observes, "[u]nilateral 'understandings' are not enough to give rise to an enforceable oral contract" under Illinois law.[275]

The facts show that, absent "prior written permission," Footstar employees remained prohibited from "rendering assistance to customers in other departments." Thus, Kmart's contextual argument that the parties intended for Footstar to indemnify Kmart for its own negligence, based on the overlapping responsibilities of Kmart and Footstar employees, is simply not supported by the evidence. Because the Master Agreement specifically limits indemnification to the acts or omissions of Footstar, it should not be interpreted as indemnifying Kmart for Kmart's own negligence. The Court also notes that Kmart and Footstar are both sophisticated parties. If Footstar had intended to indemnify Kmart for Kmart's own negligence, then the parties would likely have effectuated this intent through "clear and uniquivocal" language, as Illinois courts have long required.[276]

### B. Equitable Estoppel Against Footstar

Kmart next argues that Footstar should be estopped from claiming that the Master Agreement does not indemnify Kmart for Kmart's own negligence. According to Kmart, equitable estoppel was triggered by Liberty's May 12, 2009 letter to Kmart, which refused to defend and indemnify Kmart under the Master Agreement in another lawsuit. The letter stated: "If you are requesting that we [Liberty] indemnify for Kmarts [sic] negligence that would seem to be against public policy."

In its memorandum, Kmart argues generally that, due to this statement, Footstar's refusal to

---

[274]*See Nat'l Inspection & Repairs, Inc. v. George S. May Intern. Co.*, 600 F.3d 878, 886 (7th Cir. 2010) (holding that federal courts "will not manufacture contractual obligations that are not found fairly in the text of the agreement or that simply do not exist").

[275]Dkt. 254 at 9; *see Dynegy Mrtg. and Trade v. Multiut Corp.*, 648 F.3d 506, 515 (7th Cir. 2011).

[276]*See Westinghouse*, 70 N.E.2d at 607.

defend or indemnify Kmart for Kmart's own negligence "meets the six elements of equitable estoppel" articulated in *UIDC Mgmt. Inc. v. Sears, Roebuck and Co.*[277]  However, satisfying those elements would require proof that Liberty knowingly misrepresented or concealed a material fact (the falsity of which was unknown to Kmart ), and that Liberty intended or expected Kmart to act in reliance upon the misrepresentation, which Kmart did, to its own detriment.[278]

No estoppel factor appears to be satisfied under these facts.  First, while contracts purporting to indemnify an indemnitee against its own negligence are not against public policy in Illinois,[279] any statement to the contrary would be a misstatement of law, not of fact.  Further, even assuming that Liberty could bind Footstar in this lawsuit through statements it made to Kmart in an unrelated matter, Kmart has put forth no evidence that Liberty knowingly misrepresented a material fact with the intent or expectation that Kmart would act in reliance.  Whether Liberty even made a definitive representation is debatable, as the vague and noncommittal language "seem to be" is used.  Further, Kmart fails to demonstrate that it believed Liberty's claim, which occurred in 2009, and relied upon it to its own detriment.  Kmart argues generally that "Kmart was prejudiced because it had to incur defense costs and settlement amounts in various lawsuits."  However, Liberty's February 12, 2008 letter shows that, at least in this case, Liberty provided reasons for its denial of coverage that were wholly unrelated to public policy.  Without more, Kmart's equitable estoppel argument must fail.

## C.    Equitable Estoppel Against Liberty

Kmart argues that Liberty is estopped from denying coverage for any reason under the rule

---

[277]520 N.E.2d 1164, 1167 (Ill.App. 1st Dist. 1988).

[278]*UDIC*, 520 N.E.2d at 1167 (internal citations omitted).

[279]*See Buenz*, 882 N.E.2d at 530, n. 1 (noting that "contracts that clearly and explicitly provide indemnity against one's own negligence are valid and enforceable").

articulated *Griggs v. Bertram* .[280]  Liberty responds that the facts of *Griggs* are "far afield from this case," because "Kmart never notified [Liberty] of the accident, so Liberty could not investigate and consider whether coverage was owed."[281]

Under *Griggs* and its progeny, "an insurance carrier may be estopped from asserting the inapplicability of insurance . . . despite a clear contractual provision excluding the claim from coverage."[282]  This may occur if, "after timely notice, adequate opportunity to investigate a claim, and the knowledge of a basis for denying or questioning insurance coverage, the insurance carrier fails for an unreasonable time to inform the insured of a potential disclaimer."[283]  A delay of at least eighteen months has been held unreasonable under New Jersey law.[284]

We begin by examining whether Kmart provided timely notice to Liberty.  It is undisputed that, by August 14, 2006, "Kmart had all the information it needed to tender the Patrick Lawsuit to Footstar."[285]  However, Kmart's first verified request for insurance coverage from Footstar did not occur until January 24, 2008.[286]  With no certificate,[287] response,[288] documentation,[289] or timely

---

[280]Dkt 209 at 15; *see Griggs v. Bertram*, 88 N.J. 347, 355-356 (N.J. 1982).

[281]Dkt. 253 at 16.

[282]*See Griggs v. Bertram*, 88 N.J. at 355-356; *Fed. Home Loan Mortgage Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 446-47 (3d Cir. 2003).

[283]*Id.* at 364-265.

[284]*Id.* at 360-361 (internal citations omitted); *see also Fed. Home Loan Mortg. Corp.*, 316 F.3d 431 at 447 (20-month delay was unreasonable).

[285]FSOF ¶ 90; KRESP1 ¶ 90; dkt. 207 at ex. 12, tr. Vol. II, 182:8-14.

[286]FRESP (additional facts) ¶ 44 KREP1 ¶ 44; dkt 211, ex. 35.

[287]FRESP (additional facts)  26-27; KREP1  26-27, dkt. 211, ex. 7.

[288]Kmart admits that "Michael Mital [of Footstar] testified that he had not seen the May 23, 2007 letter prior to his deposition and that he had no reason to believe that the letter was not sent to Maureen Richards on or about May 23, 2007, and that when asked whether she had received a copy of the May 23, 2007 letter Maureen Richards answered, 'I don't know.'"  *See* KREP1 ¶ 24; dkt. 208 ex. 56 at 120:15-18, ex. 57 at 100:20-101:11).

[289]*See* FSOF  113; KRESP1  113 (Kmart disputes Footstar's statement that mention of the May 23, 2007 letter is absent from Juris, but provides no evidence to the contrary).

followup to point to,[290] Kmart is unable to substantiate its claim that it provided notice to Footstar earlier, on May 23, 2007.[291]

Despite Kmart's delay in giving notice, Liberty's claim notes reflect that Liberty was nevertheless aware of Footstar's potential liability as early as June 7, 2007. An entry recorded by Liberty's claims handler on that date reflects an interview with Alex Sehat, and states: "[w]hile attempting to pull a box, the box fell and struck the plaintiff . . . [Mr. Sehat] doesn't know who exactly was pulling the box at the time."[292] The entry continues:"Customer does not want us to make contact with plt [plaintiff's] attorney or Kmart's employee at this time as we are not yet a party in this case."[293]

While Liberty had received actual notice of the claim, the "timely notice" requirement for equitable estoppel does not appear to be satisfied. In *Griggs* and *Federal Home Loan Mortgage Corp. v. Scottsdale Insurance. Co.*, the parties seeking equitable remedies had both provided timely notice of their respective claims to the insurer. The New Jersey Supreme Court noted in *Griggs* that the insured had notified his insurer of a potential claim "shortly after" the incident giving rise to liability, and had "promptly forwarded" a copy of the complaint.[294] Similarly, in *Federal Home Loan*, the Third Circuit observed that the insured sought coverage "within three weeks" after the insurer was ordered by a Magistrate to provide a copy of the Policy.[295] Even if the Court credited

---

[290] FR1 (additional facts) 30; KREP1 30. Kmart does not dispute that it did not follow-up with Footstar until January 24, 2008.

[291] *See McPartlin v. CIR*, 653 F.2d 1185, 1991 (7th Cir. 1981) (noting that without return receipt, party could not show that it notified the opposing party by mail).

[292] *See* dkt. 215, ex. 20 at 138.

[293] *Id.*

[294] 443 A.2d at 353-54.

[295] 316 F.3d at 436.

48

Kmart with notifying Liberty in May of 2007, this would have been an eight month delay in providing notice. If we look to Kmart's January 2008 letter, the delay would be closer to 17 months. In either event, Kmart's notice to Liberty cannot be considered "timely."

More than this, the facts do not show that Liberty's own delay in disclaiming coverage met the eighteen-month threshold articulated in *Griggs* and *Federal Home Loan*.[296] By June 12, 2007, Liberty's intent to deny coverage had crystalized; Liberty's claims handler wrote, "I expect we will be brought in as a party to the case in the near future and we must be prepared for the same. If that is the situation we will look to tender the claim to Kmart . . . ."[297] This position was further solidified in an August 17, 2007 entry from Liberty's Michael Idasper, reflecting that he "would resist a tender from Kmart if it comes as they would be responsible for stacking the shelves and securing the stroller."[298] While it is true that Liberty never contacted Kmart to inquire whether Kmart desired a defense under the Policy,[299] Liberty expressly denied coverage in its February 12, 2008 response letter to Kmart.[300] This was roughly eight months after Liberty had decided to disclaim coverage. Liberty's delay, while not insignificant, does not come close to the length of delay described in *Griggs* and *Federal Home Loan*.[301]

Though Kmart acknowledges receipt of the Liberty's letter, Kmart claims it did not become aware of "any specific reasons" for Liberty's denial of coverage until December 31, 2009, when

---

[296]*See id.* at 361; *see also Fed. Home Loan Mortgage Corp.*, 316 F.3 at 447 (equitable estoppel was appropriate remedy where insurer's failure to notify insured of disclaimer met 18-month threshold articulated in *Griggs*).

[297]Dkt. 208, ex. 20 at 134.

[298]LRESP ¶ 63; ex. 20 at 132.

[299]*See* KSOF ¶ 61.

[300]KSOF ¶ 67; LRESP ¶ 67; dkt 208, ex. 3.

[301]*See Griggs*, 88 N.J. at 360-361 (18 month delay); *Fed. Home Loan Mortg. Corp.*, 316 F.3d at 447 (20-month delay).

Liberty filed its motion to dismiss this case.[302] It is true that Liberty's motion based its denial of coverage on Kmart's failure to comply with the Policy's "timely notice," "no action," and "voluntary payments" requirements, in addition to Liberty's stance that the Master Agreement showed no possibility for coverage.[303] In contrast, Liberty's February 2008 letter stated only that Footstar "is not responsible for the referenced claim [under the Master Agreement] as it is not a product liability incident."[304] While Liberty's letter was limited in scope, it was sufficient to place Kmart on notice of the fact that Kmart would need to continue defending itself. By that point, Kmart had already obtained counsel and conducted several depositions.[305] Under these facts, Kmart cannot claim there was a "long lapse of time without any indication [of disclaimer] . . . during which the insured justifiably expect[ed] to be protected by the carrier and [could] not, except at risk of forfeiting coverage, act for itself . . . ."[306]

The Court might be more sympathetic to Kmart's arguments if Kmart had provided earlier notice of the Patrick incident to Footstar. However, where Kmart has itself – without explanation – delayed providing notice of the claim, it seems disingenuous for Kmart to seek equitable remedies based on Liberty's equally unreasonable delay in disclaiming coverage. Consequently, the Court in its discretion denies Kmart's request to apply the New Jersey doctrine of equitable estoppel to bar Liberty from disclaiming coverage under the Policy.

Kmart also argues that Liberty should be equitably estopped from asserting that Footstar's employee was acting outside the scope of his employment, because Mr. Llerena's claim notes show

---

[302]Dkt. 209 at 16; *see* dkt. 50 (Liberty's motion to dismiss).

[303]*See* dkt. 50.

[304]Dkt. 208, ex 23 at1.

[305]FR1 (additional facts) ¶ 35; KRESP1 ¶ 35; Dkt. 211, ex 7 at 119:19-22.

[306]*See Griggs*, 443 A.2d at 362.

that he initially considered this argument, but later recorded that he "[did] not think arguing that [Mr. Sehat] was 'outside the course and scope of his employment' [would be] likely to succeed."[307] Equitable estoppel requires that the estopped party's conduct induced reliance in their opponent which caused that opponent to act to his own detriment.[308] Kmart argues that it relied on Liberty's "decision not to defend Footstar on this ground" by not rebutting the potential argument, and that it would be "unjust for Liberty Mutual to concede that Mr. Sehat was acting in the scope of his employment," and then change course later. The Court finds that Mr. Llerena's internal opinions on strategy do not amount to a concession on this point, and certainly do not appear intended to induce Kmart's reliance. Consequently, we decline Kmart's request to equitably estopp Liberty from asserting arguments related to Mr. Sehat's scope of employment.

### D. Indemnification for Footstar's Relative Fault

As discussed above, the Master Agreement only indemnifies Kmart for negligence "arising out of" the "performance or failure to perform" of Footstar and should not be interpreted to indemnify Kmart for its own negligence. Thus, the indemnification obligation of Footstar and Liberty depends upon a factual determination of the relative fault of Footstar in causing the Patrick injury. Kmart asserts that its potential liability to the Patricks was based on three factors: "(1) a Footstar employee, Mr. Sehat, negligently caus[ing] the car seat to fall on Judy Patrick; (2) the car seat [being] a Kmart item of merchandise; and (3) evidence that the car seat had not been secured in the stroller."[309] Liberty and Footstar deny this as to the first factor.[310] Since apportionment of

---

[307]*See* dkt. 209 at 17; dkt. 208, ex. 20 at 115, 117.

[308] *See Knorr v. Smeal*, 836 A.2d 794, 799 (N.J. 2003).

[309]KSOF ¶ 104.

[310]FRESP ¶ 104; LRESP ¶ 104.

fault was not previously adjudicated, there remains a genuine issue for trial as to the amount of Footstar's relative fault – if any – in causing Mrs. Patrick's injury.[311]

### E.    Settlement Amount

The undisputed facts show that Kmart's settlement amount of $300,000.00, plus a $10,000 Kmart gift card, was reasonable.  Not only were Mrs. Patrick's past and estimated future medical expenses already beyond the $300,000.00 mark,[312]  Liberty had estimated the upper range of a verdict at $600,000.00.[313]  Further, the eventual settlement was $40,000.00 below the mediator's recommendation of $350,000.00, and Footstar has already conceded that the settlement amount was reasonable.[314]

## VIII.  AFFIRMATIVE DEFENSES

### A.    Liberty

Liberty argues that Kmart "never [sought] Liberty's consent for the Patrick settlement," and therefore violated the Policy's "no voluntary payments" and "no action" provisions.[315]  The no voluntary payments provision states: "No insured will, except at the insured's own cost, voluntarily make a payment, assume an obligation or incur an expense . . . without [Liberty's] consent."[316]  The no action clause provides that no organization "has a right under [the Policy] . . . to bring [Liberty] into a suit asking for damages from an insured; or . . . to sue [Liberty]," unless the person or

---

[311]*See Blackshare v. Banfield*, 857 N.E.2d 743, 746 (Ill. App. 5th Dist. 2006) (finding that where an agreement does not indemnify the indemnitee for its own negligence, the indemnitor is only obligated to indemnify percentage of fault attributed to indemnitor).

[312]KSOF ¶¶ 106-107; FRESP ¶¶ 106- 107; LRESP ¶¶ 106-107; dkt 208, Exs, 20, 25 at tr. 216:4-12.

[313]KSOF ¶ 108; FRESP ¶ 108; LRESP ¶ 108; dkt 208, ex 20 at 82-83.

[314]*Id.*

[315]*Id.* at 27.

[316]Dkt 73, ex. 2 at 15.

organization is recovering on a final judgment or "agreed settlement."[317] To be "agreed," a settlement must be signed by Liberty's authorized representative.[318]

According to Liberty, Kmart's breach of these provisions excuses Liberty's performance under the Policy.[319] The undisputed facts show that Liberty was aware of the Patrick mediation, and refused to contribute anything to settlement.[320] Further, after an unsuccessful mediation, Sedgwick's claims handler informed Liberty of Kmart's attempts to settle the litigation.[321] Though Liberty's claims handler refused to contribute anything, she did not object to settlement.[322] There can be no dispute that Kmart settled the Patrick Lawsuit for a reasonable amount, and in reasonable anticipation of liability. Moreover, as discussed above, Liberty had unjustifiably denied a defense to Kmart. Under these circumstances, New Jersey law holds that Liberty has forfeited "the right to control settlements."[323]

It is well established under New Jersey law that an insurer's "unjustified refusal to comply with its contractual obligation to defend include forfeiture of the insurer's right to insist on compliance . . . with prohibitory policy conditions," such as no action and no voluntary payments.[324] Further, as observed in *The Fireman's Fund Insurance Co. v. Security Insurance Co. of Hartford*, if an insurer "delays unreasonably in investigating and dealing with a claim asserted against the insured," the insurer may "make a good faith reasonable settlement" and then recover from the

---

[317]*Id.*

[318]*Id.*

[319]Dkt. 206 at 26-27.

[320]KSOF ¶ 99; FRESP ¶ 99; dkt. 208, ex. 19 at tr. 88:21-89:20, 90:7-23.

[321]KSOF ¶ 100; FRESP ¶ 100; dkt. 208, ex. 19 at tr. 142:16-143:6.

[322]*Id.*

[323]*The Fireman's Fund Ins. Co. v. Security Ins. Co. of Hartford*, 367 A.2d 864, 868 (N.J. 1975).

[324]*Id.* (quoting "Liability Insurer – Refusal to Defend," 49 A.L.R.2d 694, 743-754 (1956)).

insurer, despite a policy provision "requiring acquiescence by the insurer in the settlement."[325] Since Liberty unreasonably refused to defend Kmart, Kmart was entitled to "protect [its] own interest in minimizing a potential liability."[326] Consequently, Liberty's affirmative defenses here fail.

Liberty also argues that its performance is excused because Kmart failed to provide notice of the claim "as soon as practicable after becoming aware that the [Policy] may apply."[327] Kmart counters that: (1) Kmart provided timely notice to Liberty as soon as Kmart became aware of the Policy, (2) Liberty cannot prove it was prejudiced by the timing of Kmart's notice, and (3) Liberty waived the right to deny coverage for untimely notice.[328] We address each argument in turn.

Kmart first argues that its notice to Liberty was timely because "[a]n insured cannot be aware that the Policy may apply to an occurrence unless and until it knows that the Policy exists . . . ."[329] Indeed, New Jersey law holds that delayed notice will be excused where the insured is unaware of insurance coverage.[330] However, Kmart's claim that it was unaware that "Footstar had any insurance at all"[331] is complicated by the fact that the Master Agreement expressly required Footstar to obtain liability insurance,[332] and it was Kmart's practice to obtain and store Certificates of Insurance from its vendors.[333] While we acknowledge that Kmart would not have been able to discern the Policy's

---

[325]*Id.* (citing *Isadore Rosen and Sons, Inc. v. Sec. Mut. Ins. Co.*, 291 N.E.2d 380, 382 (1972)).

[326]*See id.* (stating that the express or implied breach of an insurer's covenant "leaves the insured free, despite the limiting policy provisions, to protect his own interest[s]").

[327]Dkt. 206 at 18-19.

[328]Dkt. 209 at 18-24.

[329]*Id.* at 18-19.

[330]*Affiliated FM Ins. Co. v. Kusher Co.*, 627 A.2d 710, 714 (N.J. Sup. Ct. 1993) (citing cases).

[331]Dkt. 209 at 19.

[332]*Id.* at ¶18.1.

[333]Dkt. 205, ex. 7 at 134, 179-180.

provisions from such a certificate, it would have placed Kmart on notice of the insurer's identity.[334]

Kmart further argues that Footstar's June 6, 2007 notice of the lawsuit to Liberty was sufficient as to Kmart, both because actual notice is sufficient to trigger the duty defend, and because contractual provisions in the Policy itself authorized Footstar to act on Kmart's behalf in "all matters pertaining to the insurance afforded by the Policy."[335] Kmart's actual notice argument is the better of these two, as it does not appear that Footstar was acting for Kmart when it contacted Liberty.[336]

However, even if the Court accepted that Footstar's June 6, 2007 notice to Liberty also constituted notice on behalf of Kmart, this would still be more than a year after Kmart's counsel was alerted to Mr. Sehat's status as a Footstar employee by his August 14, 2006 interview.[337] Thus, Footstar's notice to Liberty in June 2007 – nearly one year after Kmart had the necessary information to tender the claim – could not constitute timely notice on behalf of Kmart.

Kmart's best argument is that Liberty cannot show it was appreciably prejudiced by untimely notice, a requirement under New Jersey law.[338] Liberty admits that it was able to perform the investigation that it wanted to perform with respect to the Patrick Lawsuit.[339] Liberty retained two independent medical examiners,[340] and concedes that there were no other witnesses in the Patrick Lawsuit that Kmart should have interviewed.[341] Liberty does not allege that it would have defended

---

[334]Kmart, however, maintains that it did not obtain a Certificate of Insurance until after settlement of the Patrick Lawsuit. *See* LSOF ¶ 282; KRESP2 ¶ 282.

[335]*Id.* at 20.

[336]Dkt. 208, ex. 20.

[337]Kmart SOF 40.

[338]*See, e.g., Cooper v. Gov't Employees Ins. Co.*, 237 A.2d 870, 874 (N.J. 1965) (finding that to excuse performance, carrier has the burden to show both breach of the notice provision and "appreciable prejudice"); *Sagendorf v. Selective Ins. Co. of Am.*, 679 A.2d 709, 715 (N.J. App. Div 1996).

[339]KSOF ¶ 86; LRESP ¶ 86; dkt 208, ex 19 at 84:20-22.

[340]KSOF ¶ 93; LRESP ¶ 93; dkt 208, ex 20, pp 80, 82, 110.

[341]KSOF ¶ 87; LRESP ¶ 87; dkt 208, ex 19 at 84:12-15.

or indemnified Kmart in the Patrick Lawsuit had it received earlier notice of the claim or incident.[342] Finally, there can be no dispute that the settlement amount was reasonable.[343] Under these circumstances, Liberty has failed to show prejudice and therefore Kmart's violation of the Policy's notice provision does not excuse Liberty's performance under the agreement.

### B. Footstar

Footstar argues that Kmart breached Section 18.3 of the Master Agreement by failing "to timely advise [Footstar] of any lawsuit, claim, or proceeding for which an indemnity is provided pursuant to [the Master Agreement]" and by failing to cooperate with Footstar.[344] Footstar contends that this breach defeats Kmart's recovery under the Master Agreement.[345] As Footstar observes, we noted in our April 14, 2010 order that, under Illinois law, failure to comply with a notification condition precedent in an insurance policy bars coverage regardless of prejudice to the insurer.[346] Kmart responds that the Master Agreement's indemnification provision was merely "incidental to [its] main purpose," and that timely notice was not an express condition precedent to indemnification.[347] Kmart argues that, under ordinary contract principles, Footstar must show it was prejudiced by Kmart's untimely notice or failure to cooperate in order for either violation to be considered a material breach excusing Footstar's performance.[348]

As an initial matter, we agree with Kmart that indemnification is only incidental to the main purpose of the Master Agreement, which authorizes Footstar to operate footwear departments in

---

[342]KSOF ¶ 114; LRESP ¶ 144; dkt 208, ex 1.

[343]KSOF ¶ 111; FRESP ¶ 111, dkt 208, ex 3.

[344]Dkt. 220 at 32-34; *see* dkt 73, ex. 1 at ¶18.3.

[345]*Id.*

[346]Dkt. 72 at 6, citing *Country Mut. Ins. Co. v. Livorsi Marin, Inc.* 222 Ill.2d 303, 317 (Ill. 2006).

[347]Dkt. 209 at 27.

[348]*Id.* at 28.

Kmart stores. Footstar cites several Illinois cases holding that the unexcused breach of an insurance policy's notice provision will defeat an insured's right to recover,[349] and argues that the same standard applies to contractual indemnity provisions.[350] However, the cases cited by Footstar in support of this proposition only observe tangentially that there is "analogy between contractual indemnity and formal insurance,"[351] and that the two are "similar."[352] This does not mean that they are the same. Illinois courts have distinguished the rules governing "professional sellers" of insurance and their policies from companies involved in a sales contract, for example, where defense or indemnity is merely incidental to the contract's main purpose.[353] Illinois law teaches that "indemnity contracts are to be construed in the same manner as any other contract."[354] Thus, the Court will interpret the contract to give effect to the intent of the parties by examining the relevant language.[355] Under this rubric, the terms and phrases contained in the contract will be given "their ordinary and natural meaning," absent any express language to the contrary.[356]

Here, the plain language of the Master Agreement does not signify notice or cooperation as a condition precedent to Footstar's indemnification obligation,[357] and the Court will not read such

---

[349]*See Country Mutual*, 222 Ill.2d at 317; *Am. Safety Cas. Ins. Co. v. City of Waukegan*, No. 07-1990, 2009 WL 855795, *6 (N.D. Ill. Mar 30, 2009).

[350]Dkt 220 at 32.

[351]*See Jinwoong, Inc. v. Jinwoong, Inc.*, 310 F.3d 962, 967 (7th Cir. 2002).

[352]*See Dextor Corp. v. Whittaker Corp.*, 926 F.2d 617, 619-21 (7th Cir. 1991).

[353]*See, e.g., Ervin v. Sears, Roebuck and Co.* 469 N.E.2d 243, 250 (Ill.App. 5th Dist.1984) (finding that party to a sales contract who is not a "professional seller" of insurance should be accorded "a greater degree of freedom" than an insurer enjoys in investigating the allegations of the complaint "for the purpose of determining" whether its contractual obligations have been triggered).

[354]*Applied Industrial Materials Corp. v. Mallinckrodt, Inc.*, 102 F.Supp.2d 934, 938 (N.D. Ill. 2000), citing *Scott Stainless Steel, Inc. v. NBD Chicago Bank*, 625 N.E.2d 293, 297-98 (1993).

[355] *See LaSalle Nat'l Trust, N.A. v. ECM Motor Co.*, 76 F.3d 140, 144 (7th Cir.1996); *Lewis X. Cohen Ins. Trust v. Stern*, 696 N.E.2d 743, 751 (Ill.App.Ct. 1st Dist. 1998).

[356]*LaSalle Nat. Trust, N.A. v. ECM Motor Co.*, 76 F.3d 140, 144 (7th Cir. 1996).

[357]Dkt 73, ex. 1 at ¶18.3.

a requirement into the contract.[358] There is no evidence that the parties intended for either party's failure of timely notice or cooperation to justify the other party's non-performance of its indemnification obligations. In fact, the agreement's non-waiver provision suggests just the opposite, expressly indicating that a party's inaction shall not constitute a waiver of any rights.[359] Under Illinois law, courts will look to the entire agreement, in order to give effect to each provision.[360] In this case, the Master Agreement as a whole suggests that Kmart's notification and cooperation obligations were only incidental to its main purpose, and that their violation would not be a material breach.

Under Illinois law, "only a material breach of a contract provision will justify non-performance by the other party."[361] Failure of performance will constitute a material breach if performance "was a *sine qua non* of the contract's fulfillment."[362] In determining this, the court will look to, among other things, whether "the breach caused disproportionate prejudice" to the non-breaching party.[363] In this case, Footstar argues that it was prejudiced by Kmart's "inexcusable delay," because Kmart "passed up multiple opportunities to settle the case for less than the amount it eventually paid."[364] Indeed the facts show that Mrs. Patrick made a pre-suit settlement demand on Kmart for $210,000.00 on January 26, 2006,[365] and a $185,400.00 offer of judgment on July 31,

---

[358]Absent plain and unambiguous language to the contrary, courts will not interpret notification clauses as a condition precedent to indemnification. *Boulevard Bank Nat Assoc. v. Phillips Med. Sys Int'l B. V.*, 811 f. Supp. 357, 365 (N.D. Ill. 1993).

[359]*Id.* at par. 21.8.

[360]*Mallinckrodt*, 102 F.Supp.2d at 938.

[361]*Borys v. Rudd*, 566 N.E.2d at 315 (collecting cases).

[362]*Sahadi v. Cont'l Ill. Nat'l Bank & Trust Co.*, 706 F.2d 193, 198 (7th Cir.1983).

[363]*Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 715 (7th Cir.1993).

[364]Dkt. 220 at 38.

[365]FRESP (additional facts) ¶ 16; KREP1 ¶ 16.

2007.[366] However, the facts surrounding Footstar's participation in the eventual $310,000.00[367] settlement suggest that Footstar, through its insurer Liberty, would not have contributed anything to previous settlement opportunities. Liberty admits that it refused to contribute anything to settlement because it believed Footstar had no liability exposure.[368] Further, Footstar has already admitted that the eventual *Patrick* settlement amount was reasonable.[369]

Under these circumstances, we agree with Kmart that earlier notice to Footstar would only have resulted in earlier denial of coverage,[370] and thus Footstar has failed to demonstrate prejudice from Kmart's untimely notice. Consequently, we hold that Kmart's violation of the Master Agreement's notice provision did not excuse Footstar's performance under the agreement.

Footstar alternatively argues that if Kmart were entitled to any rights under the indemnification provision, Kmart has waived those rights.[371] Under Illinois law, "[w]aiver arises from an affirmative act, is consensual, and consists of the intentional relinquishment of a known right."[372] A waiver need not be express and may be implied from the acts, words, conduct, or knowledge of the waiving party.[373] As discussed above, the Master Agreement contains a non-waiver provision that may only be overcome by a writing signed by the waiving party.[374] Footstar does not allege that such a writing exists, but instead argues that Kmart waived its right to indemnification

---

[366]*See* FRESP (additional facts) ¶¶ 38, 39; KREP1 ¶¶ 38, 39.

[367]This figure includes a $300,000.00 payment plus a $10,000.00 Kmart gift card. *See* KSOF ¶ 102; FRESP ¶ 102; LRESP ¶ 102; dkt 208, exs. 15, 25, 40, 40A.

[368]KSOF ¶ 99; FRESP ¶ 99; dkt. 208, ex. 19 at tr. 88:21-89:20, 90:7-23.

[369]KSOF ¶ 111; FRESP ¶ 111, dkt. 208, ex 3.

[370]*See* dkt .209 at 29.

[371]Dkt. 220 at 30.

[372]*Crum*, 620 N.E.2d at 1080; *see PPM Fin., Inc. v. Norandal USA, Inc.*, 297 F.Supp.2d 1072, 1087 (N.D. Ill. 2004).

[373]*Crum.*, 620 N.E.2d at 1080.

[374]*Id.* at ¶21.8.

by failing to notify Footstar of the *Patrick* claim within a reasonable time.[375]

As we have already mentioned, non-waiver clauses are enforceable in Illinois, and may be strictly construed "even when full compliance with the contract has not been required for a lengthy period of time."[376] However, "the weight of authority in Illinois holds that [non-waiver] provisions can be waived by [the] words and deeds of the parties, so long as the waiver is proved by clear and convincing evidence."[377] Here, Footstar points only to Kmart's considerable delay in asserting its right to a defense, which does not amount to clear and convincing evidence that Kmart affirmatively waived a known right by its words or actions. In fact, Kmart's attempted notification in May 2007, and its executed notification on January 24, 2008, show that Kmart did in fact seek to assert its rights under the indemnification provision. Under these circumstances, we find that Kmart's initial silence does not sufficiently establish an implied waiver by Kmart of any rights under the Master Agreement.[378]

---

[375] *See* dkt. 220 at 29-32.

[376] *Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 78 F.3d 266, 277 (7th Cir. 1996).

[377] *Id.* (quoting *Chicago College of Osteopathic Med. v. George A. Fuller Co.*, 776 F.2d 198, 202 (7th Cir. 1985)).

[378] *See Roboserve*, 78 F.3d at 277; *PPM Finance*, 297 F.Supp.2d at 1080.

## VIII.   CONCLUSION

For the reasons stated herein, Kmart's Motion for Summary Judgment on Counts One Through Five of its Second Amended Complaint and on Defendants' Affirmative Defenses is granted in part and denied in part [dkt. 208].  Defendant Footstar's Motion for Summary Judgment is denied [dkt. 211] and Liberty's Motion for Summary Judgment is denied [dkt. 205]. Further status set for April 12, 2012, to discuss the remaining issues in the case.

**IT IS SO ORDERED.**

**ENTERED:** <u>March 30, 2012</u>

**UNITED STATES MAGISTRATE JUDGE**
**Susan E. Cox**